MICHAEL HOWARD MARCOVITZ, APPELLANT,
v. MARY PATRICIA ROGERS, APPELLEE.
675 N.W.2d 132

Filed February 27, 2004.    No. S-02-1435.

Peter C. Wegman and Amy J. Vyhlidal, of Rembolt, Ludtke & Berger, L.L.P., for appellant.

Clarence E. Mock III and Denise E. Frost, of Johnson & Mock, for appellee.

HENDRY, C.J., WRIGHT, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MCCORMACK, J.

## NATURE OF CASE

Michael Howard Marcovitz appeals from an order dissolving his marriage to Mary Patricia Rogers. The district court for Dodge County awarded custody of the parties' four minor children to Rogers and ordered Marcovitz to pay child support. The court also ordered a division of property and declined to award Marcovitz alimony.

## BACKGROUND

Marcovitz and Rogers met in August 1982 and began living together in Denver, Colorado, later that fall. At the time, Rogers owned interests in Skyline Water Company and Diamond Head Development Company (Diamond Head), as well as a fourplex and duplex in the Copper Creek subdivision in Sarpy County, Nebraska. She received all of these assets as gifts from her father. In Denver, Rogers worked as a preschool teacher and also attended the Denver Art Institute. Marcovitz attended classes at Metropolitan State College, where he obtained a degree in bioenvironmental studies in 1985.

Marcovitz and Rogers lived in Denver for approximately 2 years. Marcovitz testified that during that time, he and Rogers began holding themselves out as husband and wife, an assertion that Rogers disputed. Marcovitz testified that the two signed a lease as husband and wife and that he gave Rogers an engagement ring. In 1985, the parties filed their federal income tax return under the status "Married filing joint return," a practice that continued for the next 15 years. The parties maintained separate bank accounts while in Colorado and, except for approximately 3 months in 1986, continued to maintain separate bank accounts for their entire marriage. Their oldest child, Forrest P. Rogers, was born on July 31, 1985. Shortly after Forrest's birth, Marcovitz and Rogers moved to Gunnison, Colorado. There, Marcovitz obtained a master's degree in aquatic ecology from Western State College in 1986, and Rogers eventually earned a bachelor of arts degree in sociology from the same institution.

During the summer of 1986, the couple moved to Birmingham, Michigan. The parties' second child, Max C. Rogers, was born on April 18, 1987. Marcovitz had received a fellowship to pursue a Ph.D. at Wayne State University, which he received in 1992. Rogers received her master's degree in 1989 and also began work on a Ph.D. Marcovitz testified that while in Birmingham, he and Rogers represented themselves to the public as being married by obtaining joint married health insurance, by signing a lease as a married couple, and by wearing wedding rings. Rogers testified that they never held themselves out to be married while living in Birmingham. She admitted that they told their children that they were married and that she believed "people just thought we were married." According to Marcovitz' petition for dissolution and Rogers' answer, the parties were married in New York in August 1991.

They moved to Ann Arbor, Michigan, in the spring of 1991, where Marcovitz received a postdoctoral fellowship at the University of Michigan. Rogers commuted to Detroit, Michigan, to continue her Ph.D. studies at Wayne State University.

The parties purchased a home in Ann Arbor, titled in Rogers' name only. Rogers had sold her duplex in Nebraska and used the proceeds for the downpayment for, and to remodel, the home in Ann Arbor. Rogers testified that she made the mortgage payments on the Ann Arbor home, but that Marcovitz would give her money to be applied toward all of the family's bills, including the mortgage.

Rogers testified that after the parties' marriage, she became concerned about the amount of property she stood to inherit after the death of her father in January 1991 and her husband's possible claims to that property. Those concerns led her to consult with an attorney in Detroit, who drafted a postnuptial agreement. Rogers testified that sometime between May and July 1992, she and Marcovitz went to the attorney's office and signed the postnuptial agreement. Marcovitz testified that the attorney represented both him and Rogers and that he did not believe that the agreement was ever executed.

Rogers testified that the signed postnuptial agreement was placed in a safe deposit box when the couple later moved to Fremont, Nebraska. Rogers testified that only she and Marcovitz

had access to the safe deposit box. When Marcovitz filed for divorce in 1993, the postnuptial agreement was missing from the safe deposit box. Rogers testified that exhibit 76 was a true and accurate copy of the postnuptial agreement signed by both herself and Marcovitz.

The postnuptial agreement includes the following recitals:

Each of the parties has made full disclosure to the other of the nature, extent, and value of their assets and income.

Each of the parties has consulted counsel in connection with the negotiation and preparation of this Agreement and are satisfied that their respect[ive] rights and interests have been fully explaine[d] to them by counsel, at the time of the execution of this Agreement[.] Notwithstanding such counsel, the parties bargained with each othe[r] as persons in a confidential relationship and agree that they ar[e] bound by the rules governing such dealings.

Section A of the agreement lists the separate property of each party. Marcovitz' separate property consists of bank accounts held in his name only and various items of personal property. Rogers' separate property is more extensive. It consists of bank accounts held in her name only, real property located in Ann Arbor, motor vehicles registered in her name, and various items of personal property. Rogers' separate property also included:

4. Any business interest or property either real or personal which [Rogers] had at the time of the marriage from her Family's Trust or has or will subsequently receive(d) from the estate of her father, Franklin Paul Rogers, who died January 13, 1991 or from the estate of [Rogers'] mother or brothers at some later date. Such business or property is more specifically described as:

a. Skyline Water Company

b. Diamond Head Corporation

c. Rogers Realty, Construction, Land and Investment Companies

d. Westgate Plaza, Inc.

e. 4 Plex at Copper Creek

5. All income, whether from the sale or leasing of the property described in Subparagraph 4, above;

6. Any property substituted for or replacing the property described in Subparagraph 4 or property purchased with any income from the property described in Subparagraph 4, above[.]

The agreement waived any interest a party may have in the separate property of the other party. The agreement also specified that "[a]ny property or income acquired hereafter in their joint names or with the use of joint assets or income derived from employment by either party" was to be considered marital property. The agreement also stated that it "shall be interpreted and enforced in accordance with the laws of the State of Michigan in effect at the time of its execution."

In August 1992, Marcovitz accepted a job as an assistant professor of biology at Midland Lutheran College in Fremont. His salary for the 2002-03 academic year was $38,505. Rogers taught briefly at Metropolitan Community College and Midland Lutheran College, and later at Creighton University as a part-time professor. The family purchased a house in Fremont, jointly titled. The $24,022 downpayment for the house came from the proceeds of the sale of the house in Ann Arbor. The parties carried a mortgage on the house for approximately 6 months before paying off the remainder of their obligation, $95,000. The funds for the mortgage payoff came from Rogers' personal account and represented money that she had received from her father's estate. Three major improvements were made to the house over time. Marcovitz testified that the improvements were paid for from their joint account. However, Rogers produced evidence that the improvements were paid for from her personal account using more than $120,000 in funds she had inherited from her father's estate. The Fremont house was appraised at the time of trial at a value of $225,000.

Marcovitz initiated this action by filing a dissolution petition on August 9, 2000. Rogers filed an answer and cross-petition on August 23. At trial, it was established that Rogers owns a 20-percent interest in Westgate Plaza, Inc. (Westgate), that has a discounted value of $636,765. Rogers receives a monthly salary of $3,000 from Westgate and an annual bonus of approximately $40,000 to $44,000. Rogers also owns a 20-percent interest in Diamond Head. The value of her interest in Diamond Head is "a lot lower" than $87,000. Rogers also owns a 20-percent interest in

Eagle Ridge Development Company (Eagle Ridge). Her interest in Eagle Ridge was acquired from her siblings as a gift after the death of her father. However, there is also testimony that Rogers paid $1,200 for her interest in Eagle Ridge, which was deducted from a subsequent distribution to her. Rogers' interest in Eagle Ridge was valued at approximately $900,000 after discounts.

A decree dissolving Marcovitz' and Rogers' marriage was entered on December 2, 2002. The court awarded custody of the parties' four children to Rogers, subject to the terms of visitation set forth in the decree. Marcovitz was ordered to pay child support in the amount of $759.46 per month for four children, $743.04 for three children, $585.81 for two children, and $423.04 for one child. In calculating child support, the district court found that "[o]nly [Rogers'] income from Westgate Shopping Plaza should be used as 'income' for calculation of child support because [Rogers'] other income is proceeds from the sale of inherited property." Marcovitz was also ordered to pay 32 percent of the children's medical expenses not covered by insurance. Neither party was awarded alimony. Rogers was awarded the parties' marital residence, two vehicles, various items of personal property, and retirement accounts in her own name. Finally, the court ordered Rogers to pay $12,000 in attorney fees.

## ASSIGNMENTS OF ERROR

Marcovitz assigns that the district court erred in (1) awarding custody of the four minor children to Rogers; (2) failing to award him alimony; (3) calculating child support by (a) failing to include all of Rogers' income, (b) failing to deviate downward due to his parenting time, and (c) requiring him to pay 32 percent of all of the children's uncovered medical expenses; (4) considering the terms of the postnuptial agreement in determining the marital estate; (5) setting off to Rogers as nonmarital property the parties' residence, certain personal property, and an interest in a real estate corporation; (6) awarding him an inadequate amount of attorney fees; and (7) failing to award him any portion of Rogers' separate property.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether

there has been an abuse of discretion by the trial judge. *Schaefer v. Schaefer*, 263 Neb. 785, 642 N.W.2d 792 (2002).

## ANALYSIS

### CHILD CUSTODY

■ In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal. *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998).

■ When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Id.*; Neb. Rev. Stat. § 42-364 (Reissue 1998). In determining a child's best interests under § 42-364, courts

> " 'may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension regardless of chronological age, and when such child's preference for custody is based on sound reasons; and the general health, welfare, and social behavior of the child.' "

*Davidson v. Davidson*, 254 Neb. at 368, 576 N.W.2d at 785.

■ Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Davidson v. Davidson, supra.*

Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

Our de novo review of the record reveals that the district court did not abuse its discretion in awarding custody of the four minor children to Rogers. In addition to those facts recited above, each party generally testified that he or she was more involved in the parenting of the children and was more fit to parent the children than the other. Neither party had many complimentary things to say about the other. Marcovitz testified that while living in Birmingham and Ann Arbor, he was more involved in caring for Forrest and Max than was Rogers. He further testified that he was extremely involved in Forrest and Max's education, that he knows all their teachers and coaches, and that he helped prepare Forrest for the ACT examination. He testified that Rogers has almost no involvement with the children's teachers. He also testified that he has coached the children's soccer teams and introduced them to ballet.

Marcovitz related several concerns about Rogers that he had, should she be awarded custody. He testified that he was concerned about Rogers' mental and religious stability as well as her availability for the children's activities. He was also concerned about the several men that Rogers had relationships with, her history of seeing numerous therapists, the cosmetic surgery she has had and the impact it may have on their daughter, Rogers' "addiction" to the Internet and the pornographic e-mails she has received, and the many "pleasure" trips Rogers takes out of Nebraska.

Rogers' testimony paints a different picture. She testified that she was Forrest and Max's primary caretaker while the parties lived in Gunnison and after moving to Fremont. She testified that she encouraged the children to read, enrolled them in dance classes, took them to museums and art classes, and introduced them to music lessons. She testified that Marcovitz objected to the children's participation in a program designed to help newly divorced families deal with the change as well as her attempts to get therapists for the children. Rogers describes Marcovitz as primarily concerned about his job and as a "judgmental, controlling person who is inflexible."

In awarding custody of the children to Rogers, the district court made the following findings:

Both parties love the children and have their respective strengths and weaknesses as parents with each party's parental weaknesses fortunately offset by the parental strengths of the other party and therefore, the children need parental involvement from both parties. [Marcovitz] has leveled a number of criticisms against [Rogers] ranging from sexual misconduct to allowing excessive school tardiness. However, in each case, credible witnesses involved in the children's daily li[ves], including those with expert knowledge related to their educational pursuits and extra curricular activities, testified the children have suffered neither demonstrative physical or psychological impairment related to [Rogers'] conduct nor any adverse effect upon their educational or spiritual development. The record demonstrates [Rogers'] avid interest in ensuring the intellectual and spiritual development of the parties' children by arranging participation by the children in a broad spectrum of secular and religious activities.

. . . Though similarly interested in the children's intellectual and spiritual development, [Marcovitz] was less willing to candidly assess his own conduct related to the children. The evidence demonstrates [Marcovitz], though motivated by good intentions, acted inappropriately with teachers and others involved in the children's care, sometimes resorting to disparaging remarks about [Rogers] within hearing range of the children. Moreover, of concern to the Court was proof [Marcovitz] engaged in conduct attempting to undermine [Rogers'] ability to smoothly administrate the children's activities on a daily basis.

From our de novo review of the record in this case, it is apparent that the parties have sharply conflicting testimony as to the other's fitness to parent the children. As noted above, where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998). We conclude that the district court

did not abuse its discretion in awarding custody of the children to Rogers.

## ALIMONY

Marcovitz next argues that the district court erred in refusing to award him alimony. In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Bowers v. Lens*, 264 Neb. 465, 648 N.W.2d 294 (2002). The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). In awarding alimony, a court should consider, in addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 1998), the income and earning capacity of each party as well as the general equities of each situation. *Bauerle v. Bauerle*, 263 Neb. 881, 644 N.W.2d 128 (2002). The criteria in § 42-365 include

> the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

As mentioned, one of the statutory criteria to be considered is the duration of the marriage. Marcovitz contends that his marriage to Rogers should be considered a 20-year marriage rather than an 11-year marriage. He argues that when the parties started living together in Colorado in 1982, they formed a common-law marriage under Colorado law. See, generally, *People v. Lucero*, 747 P.2d 660 (Colo. 1987). However, there is no indication in our record that this argument was made to the district court, and the district court's order did not address this issue. An issue not presented to or decided by the trial court is not appropriate for consideration on appeal. *State ex rel. City of Alma v. Furnas Cty. Farms*, 266 Neb. 558, 667 N.W.2d 512 (2003). When considering the duration of the parties' marriage, we consider it to be an 11-year marriage.

Marcovitz' remaining argument regarding alimony focuses on the disparity in income between the parties. Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. *Bauerle v. Bauerle, supra.* However, we have also stated that " ' "[d]isparity in income or potential income may partially justify an award of alimony." ' " *Id.* at 891, 644 N.W.2d at 136. The record in this case indicates a great disparity between the incomes of the parties. Marcovitz' adjusted gross income in 2000 was $28,248; Rogers' was $236,822. The gap in income was not closed in 2001, when Marcovitz' adjusted gross income was $30,997 and Rogers received $285,000 in distributions from Eagle Ridge *alone.* Marcovitz testified that his living expenses were approximately $3,200 per month; Rogers testified that her living expenses were approximately $11,000 per month.

In prior cases, we have upheld alimony awards in situations involving smaller income disparities than in this case. See, *Bauerle v. Bauerle, supra* (upholding alimony award to wife of $1,500 per month for 120 months where husband's monthly income after expenses was $2,695 and wife's monthly income after expenses was $148); *Kelly v. Kelly,* 246 Neb. 55, 516 N.W.2d 612 (1994) (noting that when wife had earning capacity of $34,000 and husband's was $100,000, alimony award of $1,500 per month for 120 months was not abuse of discretion as it tended to even out income disparity). We also note that nonmarital property not subject to property division may be taken into account when determining alimony. See *Bauerle v. Bauerle,* 263 Neb. 881, 644 N.W.2d 128 (2002) (court may take into account property acquired by inheritance when determining alimony). Based upon the disparity of income in this case and the division of property explained in greater detail below, we modify the decree and order Rogers to pay Marcovitz alimony in the amount of $2,000 per month for 10 years. Pursuant to § 42-365, Rogers' obligation shall terminate upon the death of either Rogers or Marcovitz or upon Marcovitz' remarriage.

## CHILD SUPPORT

Marcovitz assigns that the district court erred in calculating child support. His argument is threefold. First, he contends that the court failed to consider and include some of Rogers' income

in the calculations. Second, he argues that a downward deviation from the child support guidelines is warranted because of the amount of his visitation and parenting time. Finally, while not directly related to the amount of his monthly child support payments, Marcovitz argues that the court erred in ordering him to pay 32 percent of the children's uncovered medical expenses.

The Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, a court must consider the total monthly income, defined as the income of both parties *derived from all sources*, except all means-tested public assistance benefits and payments received for children of prior marriages. *Henderson v. Henderson*, 264 Neb. 916, 653 N.W.2d 226 (2002). In this case, the district court's calculations were based upon Rogers' income from her ownership interest in Westgate. The court did not include Rogers' income from other sources because it found that that income was derived from the sale of inherited property.

Rogers argues that proceeds from the sale of inherited property are not "income" when calculating child support. She relies on two cases from other jurisdictions for this proposition. In *Thomas v. Thomas*, 932 P.2d 54 (Okla. Civ. App. 1996), the father sold a house, which he had previously inherited, for $36,000, payable in monthly installments of $1,000. A portion ($147.08) of each monthly installment was interest. The trial court included all the proceeds of the sale of the house in the father's income for child support calculation purposes. That decision was reversed on appeal. The court held:

> Payments on a promissory note consist of a return of principal and the interest on that principal. The return of the principal is not "income," and therefore cannot be included in the combined "gross income" of both parents. The interest on a promissory note is income, and should be included when computing the combined gross income.

*Thomas v. Thomas*, 932 P.2d at 55. Similarly, the Alaska Supreme Court has said that the interest from the sale of inherited property qualifies as income for purposes of calculating child support, while the principal amount of gifts and inheritances does not. *Robinson v. Robinson*, 961 P.2d 1000 (Alaska 1998).

Rogers accurately relates the rule from *Thomas v. Thomas, supra,* and *Robinson v. Robinson, supra.* Her error, however, is in applying it in this case. Eagle Ridge and Diamond Head are real estate development entities and generate profits by selling land owned by each. Rogers contends that the sale of the real estate held by Eagle Ridge and Diamond Head is the sale of inherited property. However, the record indicates otherwise. It indicates that Rogers did not inherit any land owned by these entities, but, rather, inherited an ownership interest in each. Those ownership interests were never sold by Rogers. Thus, the income from Diamond Head and Eagle Ridge was not income from the sale of inherited property, but instead was merely income produced by the inherited property itself. The district court erred in including only Rogers' income from Westgate in the calculations.

At trial, several child support calculation worksheets were entered into evidence. Each calculated child support after factoring for several different variables. Based upon our above conclusion that Rogers' income from Diamond Head and Eagle Ridge should be included in the child support calculations, we conclude in our de novo review that Marcovitz' child support obligation should be ordered in accordance with exhibit 111, which includes Rogers' additional income in its calculations. Exhibit 111 indicates that Rogers' monthly net income is $14,705.08 and that Marcovitz' monthly net income is $2,405.11. Pursuant to that worksheet, we modify the decree and order Marcovitz to pay child support in the amount of $362.74 per month for the support of four minor children, $334.32 for the support of three minor children, $279.16 for the support of two minor children, and $191.24 for the support of one minor child.

Next, Marcovitz claims that his child support obligation should be adjusted downward because of the "liberal" amount of visitation accorded to him by the decree. Paragraph J of the guidelines allows a court, at its discretion, to adjust child support when visitation substantially exceeds alternating weekends and holidays. Marcovitz contends that his child support should be adjusted downward by at least 50 percent because of his "extensive weekend parenting time, religious holiday parenting time and summer parenting time." Brief for appellant at 37.

Marcovitz' visitation schedule consists of three general types of visitation. First, Marcovitz has weekend visitation every other weekend from 5 p.m. Thursday to 7:30 a.m. Monday and has visitation on Thursday evening from 5 to 8:30 p.m. during the weeks when there is no scheduled weekend visitation. Second, the court made provisions for visitation for a number of specific secular and Jewish holidays, although Marcovitz has visitation for only approximately half of those holidays in any year. Third, Marcovitz has visitation for one-half of the children's summer vacation, and if he has the children for 4 continuous weeks during the summer, his child support obligation is reduced by 50 percent. This is the only adjustment for child support that the district court made.

▮ Generally, child support payments should be set according to the guidelines. *Bondi v. Bondi*, 255 Neb. 319, 586 N.W.2d 145 (1998). We have previously entertained, and rejected, an argument that a parent's visitation schedule called for the calculation of child support pursuant to a joint custody arrangement rather than a sole custody arrangement. See *Heesacker v. Heesacker*, 262 Neb. 179, 629 N.W.2d 558 (2001). In this case, Rogers was granted sole custody of the parties' children. In addition, Marcovitz' visitation schedule is not appreciably different from the visitation schedules mentioned in *Heesacker* and the cases cited therein. Thus, we conclude the district court did not abuse its discretion in declining to reduce Marcovitz' child support obligation based on his visitation schedule.

The decree also ordered Marcovitz to maintain health insurance for the benefit of the children and to pay 32 percent of the children's medical expenses not covered by insurance. This term of the decree is consistent with the version of paragraph O of the guidelines in effect prior to September 1, 2002. However, a different version of paragraph O was in effect on December 2, 2002, the date the district court entered the final decree in this case. Paragraph O currently provides:

> Children's health care expenses are specifically included in the guidelines amount of up to $1,200 per family unit per year. Children's health care needs are to be met by requiring either parent to provide health insurance as required by state law. All nonreimbursed reasonable and necessary children's

health care costs in excess of $1,200 per family unit per year shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution (worksheet 1, line 6).

Accordingly, we further modify the decree and order Marcovitz to pay 14 percent of the children's uncovered medical expenses in excess of $1,200.

## DIVISION OF PROPERTY

With respect to the district court's division of property, Marcovitz argues that the court erred in (1) considering the terms of the postnuptial agreement and (2) setting off to Rogers as nonmarital property the parties' residence.

## POSTNUPTIAL AGREEMENT

Marcovitz argues that "[t]he only allowable postnuptial agreements in Nebraska are those made in contemplation of death, wherein NEB. REV. STAT. § 30-2316 [(Reissue 1995)] authorizes waiver by contract of a surviving spouse's 'right of election.' In re Estate of [Kopecky], 6 Neb. App. 500, 505, 574 N.W.2d 549, 553 (1998)." Brief for appellant at 28. He also contends that the postnuptial agreement is "invalid and unenforceable because there was inadequate disclosure, no consideration and such agreements at the time allegedly made were against public policy of this state." (Emphasis omitted.) Brief for appellant at 27.

Marcovitz errs in evaluating the validity of the postnuptial agreement under Nebraska law. The terms of the postnuptial agreement expressly dictated that it be interpreted under Michigan law, where one of the parties alleges it was executed in 1992. The Michigan Court of Appeals has addressed the validity of postnuptial agreements in *Rockwell v. Estate of Leon Rockwell,* 24 Mich. App. 593, 180 N.W.2d 498 (1970), which is the most recent published opinion from Michigan addressing that issue. The court stated:

Post-nuptial agreements are not invalid *per se.* . . .

There are several situations in which Michigan Law recognizes the validity of agreements such as the one involved in the instant case. Post-nuptial agreements made during an existing separation are thought to further judicial policy favoring settlement of controversies over litigation. . . . In

addition, Michigan is one of the majority of jurisdictions that approve post-nuptial agreements in which a wife releases her interest in her husband's property on his death . . . if it is a fair and voluntary one for a fair consideration. . . . However, objections are validly raised to post-nuptial agreements where those agreements seek to effectuate a separation or contemplate a future separation.

(Citations omitted.) *Id.* at 596-97, 180 N.W.2d at 500.

Under *Rockwell*, the postnuptial agreement in this case is valid. In the agreement, each party released any interest he or she might have in the estate of the other if one should die, and each party also waived any interest in the separate property of the other upon separation or divorce. While Michigan has invalidated postnuptial agreements "where those agreements seek to effectuate a separation or contemplate a future separation," that rule is not applicable here. *Id.* at 597, 180 N.W.2d at 500. The *Rockwell* court, in upholding a postnuptial agreement, said that "[t]here is nothing in this record to suggest that the agreement was calculated to bring about a separation" or that "a separation was contemplated by the parties." *Id.* The *Rockwell* court distinguished another case in which a postnuptial agreement was held invalid because there, "the parties contemplated a separation in the near future." *Id.*, citing *Day v. Chamberlain*, 223 Mich. 278, 193 N.W. 824 (1923). In our case, there is likewise no evidence that Marcovitz and Rogers were contemplating separation or divorce at the time they executed the agreement. The agreement itself recites that "this Agreement is made without either party having the intention to separate or initiate a divorce or dissolution proceeding." Under Michigan law, the postnuptial agreement is valid.

### MARITAL RESIDENCE AND OTHER PROPERTY

Marcovitz also argues that the district court erred in awarding the marital residence to Rogers as her separate property. The residence was jointly titled. Pursuant to the postnuptial agreement, "[a]ny property . . . acquired hereafter in their joint names" shall be considered the joint and marital property of the parties. Although Rogers testified that in her opinion, the "Commingling" clause of the postnuptial agreement would allow her to recover whatever money she put into the residence, the clause itself belies

her belief. It states in part that "[i]t is the parties' intention that such commingling or pooling of assets not be interpreted to imply any abandonment of the terms and provisions of this Agreement and that *the provision contained herein addressing the parties' interests in jointly-held property be applied.*" (Emphasis supplied.) The marital residence was the joint property of the parties, and the district court erred in awarding it to Rogers as her separate property. The house was valued at the time of trial at $225,000. We therefore order Rogers to pay Marcovitz one-half of the value of the house ($112,500).

## ATTORNEY FEES

In his penultimate assignment of error, Marcovitz contends that the $12,000 attorney fee award to him was insufficient. He argues that a larger award is warranted because he incurred approximately $30,000 in legal fees during the course of this action.

In an action for dissolution of marriage, the award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Bowers v. Lens*, 264 Neb. 465, 648 N.W.2d 294 (2002). In our de novo review, we conclude that the district court did not abuse its discretion in awarding Marcovitz $12,000 in attorney fees.

## NONMARITAL PROPERTY

In his final assignment of error, Marcovitz argues that the district court erred in failing to award him any of Rogers' nonmarital property. When awarding property in a dissolution of marriage, the property acquired by one of the parties through gift or inheritance ordinarily is set off to the individual receiving the inheritance or gift and is not considered a part of the marital estate. *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997). An exception to the rule applies where both of the spouses have contributed to the improvement or operation of the property which

one of the parties owned prior to the marriage or received by way of gift or inheritance, or the spouse not owning the property prior to the marriage or not receiving the inheritance or gift has significantly cared for the property during the marriage. *Id.*

We have recognized that in cases where this exception was applied, we have required evidence of the value of the contributions and evidence that the contributions were significant. *Id.* In this case, Marcovitz has failed to produce evidence of the value of his contributions. This assignment of error is without merit.

## CONCLUSION

We affirm the district court's decision to grant custody of the parties' minor children to Rogers. We also affirm the district court's award of attorney fees to Marcovitz.

We modify the decree in the following respects: (1) Rogers is ordered to pay alimony to Marcovitz in the amount of $2,000 per month for 10 years, which obligation shall terminate upon the death of either Rogers or Marcovitz or upon Marcovitz' remarriage; (2) we order Marcovitz to pay child support in the amount of $362.74 per month for the support of four minor children, $334.32 for the support of three minor children, $279.16 for the support of two minor children, and $191.24 for the support of one minor child; (3) we order Marcovitz to pay 14 percent of the children's uncovered medical expenses in excess of $1,200; and (4) we order Rogers to pay Marcovitz $112,500 as one-half the value of the house.

AFFIRMED AS MODIFIED.

CONNOLLY, J., not participating.