IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

KELLOGG V. KELLOGG

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CLYDE M. KELLOGG, APPELLEE,
V.
DIAN L. KELLOGG, APPELLANT.

Filed August 6, 2013.    No. A-12-738.

Appeal from the District Court for Washington County: JOHN E. SAMSON, Judge. Affirmed.

Paul J. Gardner, Kevin J. McCoy, and Aaron F. Smeall, of Smith, Gardner, Slusky, Lazer, Pohren & Rogers, L.L.P., for appellant.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellee.

PIRTLE and RIEDMANN, Judges, and MULLEN, District Judge, Retired.

RIEDMANN, Judge.

### INTRODUCTION

Dian L. Kellogg appeals from the order of the district court for Washington County dissolving her marriage to Clyde M. Kellogg, approving the parties' property settlement agreement, ordering Dian to pay alimony to Clyde, and ordering Clyde to pay $2,000 toward Dian's attorney fees. On appeal, Dian challenges only the court's order of alimony, arguing that no alimony was warranted or, in the alternative, that the alimony awarded was excessive in both duration and amount. Upon our de novo review of the record, we find no abuse of discretion by the trial court and affirm its decision.

### BACKGROUND

Dian and Clyde were married in March 1982. They had two children during their marriage, but both children had reached the age of majority at the time of trial.

- 1 -

On October 21, 2010, Clyde filed a complaint for dissolution of marriage. In the complaint, Clyde asked that the parties' marriage be dissolved, that their marital assets and debts be equitably divided, and that he be awarded attorney fees and alimony. Dian filed an answer, asking that the parties' marriage be dissolved, that their marital assets and debts be equitably divided, that neither party be required to pay alimony to the other, and that she be awarded attorney fees.

Trial was held on June 20 and 21, 2012. At trial, the parties indicated to the court that they had reached a partial property settlement agreement. Thus, the remaining issues left for the court to decide included division of Dian's 401K account, Clyde's pension, and a few marital debts; Clyde's request for alimony; and each party's request for attorney fees.

At the time of the trial, Dian was 52 years old and described her health as "very good." She testified that she continued working for the first couple of years of the marriage but began staying home to care for the parties' children in 1984. Since she reentered the workforce in 1994, Dian steadily worked her way up to her current position and salary. She was employed by a telemarketing company from 1994 until 1998 at an hourly rate of $12.50. Dian then worked briefly for a trucking company before she was hired by a health insurance company in 2000. She worked for the health insurance company until 2003, earning an annual salary of $35,000. From December 2003 through the end of 2005, Dian worked for another health insurance company at an annual salary of $38,000.

Dian has been with her present employer, another health insurance company, since January 2006 and is currently a senior sales executive. She was hired at a base salary of $49,000, but her current base salary is $71,000 per year and she is eligible for quarterly bonuses and monthly commissions. Dian testified that her income fluctuates, but that she generally expects to earn a commission every month and usually receives her quarterly bonus. Her gross income in 2009 was $133,539; in 2010, it was $106,780; in 2011, it was $157,000; and in the first 5 months of 2012, Dian earned $126,546.43. Dian's monthly expenses are approximately $6,900.

At the time of the trial, Clyde was 57 years old. He worked for a railroad company from 1971 until 1997. The highest salary Clyde earned while working for the railroad was $85,000 per year. His employment with the railroad ended due to an illness for which he was subsequently awarded railroad disability benefits. He has been receiving such benefits since approximately 2000 and currently receives $2,852.30 per month. Clyde also currently receives $750 per month in pension from the railroad. His pretax income in 2011 was $43,245.36.

Clyde testified that his current monthly expenses are $4,035. This amount includes $200 per month for a membership at a private country club, an unspecified amount for a fitness club membership, and $600 per month for his vehicle. Clyde also testified that he had been living with his girlfriend in her house since March 2012 and that he pays her $1,325 for rent per month. His girlfriend confirmed that although they had only made one mortgage payment at the time of trial, Clyde had given her $1,325 toward the first month's payment.

Clyde characterized his overall health as "not very good" and believes it has declined since 2000. He has been diagnosed with failed back syndrome and underwent four back surgeries between 2000 and 2011. He has also been diagnosed with myoclonus, a neurological condition which causes involuntary body tremors throughout Clyde's torso and upper extremities. At the

time of trial, Clyde was taking several medications, including "Klonopin, Diazepam, a neurontin, Oxycodone, [an] inhaler . . . , and blood pressure medicine."

Clyde admitted that he has done some work since working for the railroad, but that he has not held a full-time position since 1997. He testified that he is able to earn up to $740 per month and still retain his disability benefits. Clyde's testimony regarding the amount and type of work he performed and the compensation he received was somewhat vague and inconsistent, but we will summarize it as best we can.

Clyde worked for an engineering company from 2000 to 2006 as a driver and "errand boy," working approximately 15 to 20 hours per week. He was compensated by receiving gas reimbursement, lenient use of a credit card, and occasional country club privileges. Clyde and Dian were separated for one of the years during that period, and during their separation, Clyde received a free house to live in with paid utilities as compensation from his employer. The free rent he received was valued at approximately $1,500 to $1,800 per month. Clyde also worked for a lawn and landscape company from December 2010 through the spring of 2011. He testified that he received two checks for between $700 and $735 each and free room and board as compensation. He also admitted that after their separation, he returned to their 11-acre property to mow "a handful of times," and that Dian paid him for this work. Clyde currently holds a commercial driver's license, which he renewed in approximately 2011.

Clyde underwent a vocational evaluation with James Rogers, a vocational rehabilitation counselor, in November 2011. In his report, Rogers opined that although Clyde may be able to do some "occasional" or "intermediate" work, the work that he can do is so limited that there is no reasonably stable line of work that he can do. He concluded that Clyde is totally disabled. At trial, when asked to explain his conclusion, Rogers testified that Clyde can do some occasional work, but that he would not be able to work a job 8 hours per day, 40 hours per week. Rogers testified that he has seen many people with failed back syndrome, but that he has never seen one of them go back to work on a full-time basis. Rogers acknowledged that Clyde had an active commercial driver's license, but that he does not believe Clyde could work as a truckdriver, because of reliability problems associated with Clyde's neurological disorder.

In April 2012, Clyde met with another vocational rehabilitation counselor, Kim Rhen. In her report, Rhen recounted Clyde's medical and employment history. She noted that Clyde told her that since leaving the railroad, he has not worked for any employer who would report his earnings and has not applied for a job in which his earnings would be reported. In addition, Clyde advised her that he continued to work for a number of employers for payment "in kind" through the spring of 2011, but that he stopped working after that point for fear of losing his disability benefits. Rhen testified at trial that she did not believe that Clyde was completely unemployable, pointing out that none of Clyde's medical providers assigned permanent restrictions or restricted him from working using his commercial driver's license. She opined that Clyde would be suitable and employable for several positions at the light physical demand level. She admitted that she did not believe any of these positions would pay Clyde more than $34,000 per year.

In April 2012, Dr. Michael T. O'Neil performed an independent medical examination on Clyde. He reviewed Clyde's medical records and back x rays, gathered medical history from Clyde, and examined his back. Dr. O'Neil noted that during the examination, Clyde's speech was

spasmodic, and that even though Clyde was articulate, he had difficulty getting words out in a fluent manner. Dr. O'Neil also observed that Clyde's hands and head shook and that his upper body twitched and moved constantly. Dr. O'Neil agreed with the diagnosis of failed back syndrome and rendered the opinion that from an orthopedic standpoint, Clyde was unemployable unless the employment was sedentary. He opined that Clyde would be unable to engage in physical activity requiring repetitive stooping, bending, twisting, and lifting more than 10 to 15 pounds frequently and 25 to 30 pounds occasionally. According to Rhen's report, however, these restrictions would actually place Clyde at the light physical demand level; the same level at which she placed Clyde.

Dr. O'Neil also rendered the opinion that Clyde's back will not improve. This opinion conflicts with the opinion of Clyde's treating neurosurgeon, who opined that same month that Clyde's back injury should resolve with time. In addition to Clyde's back problems, Dr. O'Neil believed from a neurological point of view that Clyde was more disabled because of the myoclonic disorder, and probably totally disabled and unemployable, although he qualified his statement by saying that such an opinion should come from a neurologist and not from him.

After the trial, the district court entered a decree of dissolution. The court adopted the parties' partial property settlement agreement, divided Dian's 401K account, and awarded Clyde his entire retirement pension, but took this amount into consideration in determining alimony. In addition, the court found that Clyde could not be gainfully employed at a rate of compensation in excess of the amount of disability benefits he currently receives and imputed that amount of income to Clyde for purposes of calculating alimony. The court found alimony was justified and ordered Dian to pay Clyde alimony in the amount of $500 per month for 84 months. Finally, the court ordered Clyde to pay $2,000 toward Dian's attorney fees.

Dian appeals from the district court's decree of dissolution.

## ASSIGNMENT OF ERROR

On appeal, Dian's sole assignment of error is that the court erred in ordering her to pay Clyde alimony or, in the alternative, that the alimony awarded is excessive in terms of duration and amount.

## STANDARD OF REVIEW

In an action for dissolution of marriage, an appellate court reviews de novo on the record the trial court's determination of alimony; a determination regarding alimony, however, is initially entrusted to the trial court's discretion and will normally be affirmed in the absence of an abuse of that discretion. *Smith v. Smith*, 20 Neb. App. 192, 823 N.W.2d 198 (2012). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Id*.

## ANALYSIS

Dian alleges that the district court erred in ordering her to pay alimony to Clyde. She argues that the trial court abused its discretion because it failed to attribute any additional income or earning capacity to Clyde beyond his disability benefits, failed to consider the ephemeral nature of her bonuses, and failed to consider the absence of any change in Clyde's lifestyle. We

conclude that the district court did not abuse its discretion in awarding alimony, and therefore, we affirm.

In an action for dissolution of marriage, an appellate court reviews de novo on the record the trial court's determination of alimony; a determination regarding alimony, however, is initially entrusted to the trial court's discretion and will normally be affirmed in the absence of an abuse of that discretion. *Smith, supra*. A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Id*.

In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004). The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*. In awarding alimony, a court should consider, in addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2008), the income and earning capacity of each party as well as the general equities of each situation. *Marcovitz, supra*. The criteria in § 42-365 include

> the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

Alimony should not be used to equalize the incomes of the parties or to punish one of the parties; however, disparity in income or potential income may partially justify an award of alimony. *Marcovitz, supra*. The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). In reviewing a trial court's award of alimony, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Hosack v. Hosack*, 267 Neb. 934, 678 N.W.2d 746 (2004).

Clyde and Dian's marriage was one of long duration. They were married for 28 years prior to separating, and they raised two children to the age of majority during the marriage. Evidence from trial reveals that both parties made financial contributions to the marriage. Initially, Clyde supported the family financially while Dian stayed home to care for the children. Once Clyde's employment at the railroad ended and he was no longer able to work, Dian became the main financial support for the family, particularly in the last few years of the marriage. The parties testified that they were able to live an above-average lifestyle.

Dian argues that the district court erred in failing to attribute any additional income or earning capacity to Clyde. We recognize that earning capacity for the purpose of alimony encompasses more than one's ability to earn a wage and includes income from all sources. See *Ainslie v. Ainslie*, 4 Neb. App. 70, 538 N.W.2d 175 (1995).

Although at the time of trial Clyde's only income was his disability benefits and pension payment, the record establishes that Clyde has earned additional income beyond his benefits in

the past, both in cash and in kind. He admitted to Rhen that he discontinued working in May 2011, not because he was unable to continue due to medical problems, but, rather, because he was afraid he would lose his disability benefits as a result of exceeding the income limitation. In addition, Clyde's vocational rehabilitation expert testified that although he considers Clyde to be totally disabled, Clyde is able to do some "occasional" or "intermediate" work. Clyde admitted that he is able to earn up to an additional $740 per month without losing his benefits, and the record establishes that he was earning more than that when considering the in-kind payments he received during some periods of time. We have held in calculating child support that the value of in-kind benefits may be included in determining a party's income. See, e.g., *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004); *Morrill County v. Darsaklis*, 7 Neb. App. 489, 584 N.W.2d 36 (1998). We believe it likewise may be included in determining income for purposes of calculating alimony.

We note, however, that Clyde's additional employment has been sporadic. The record reveals that Clyde was employed by an engineering company intermittently from 2000 to 2006, but that his employment was terminated because Clyde "could not be reliable." The only other employment the record reveals is a few months' stint from 2010 to 2011 when Clyde worked at a landscaping company owned by his niece and nephew who were "desperate for help." Clyde's vocational rehabilitation expert testified that Clyde was not employable due to the unpredictable nature of his myoclonus and his failed back syndrome.

Based upon the record before us, we determine that while not totally unemployable, Clyde is akin to an odd-lot worker who cannot be employed regularly in any well-known branch of the labor market. See, e.g., *Lovelace v. City of Lincoln*, 283 Neb. 12, 809 N.W.2d 505 (2012). To attribute regular income to him in such a situation would be unfair.

Dian also argues that the trial court abused its discretion in considering her bonuses and commissions when calculating her income. In the decree, the district court noted that Dian's income has fluctuated over the past several years and that a good portion of her income is attributed to bonuses and commissions. Dian's year-to-date gross income at the time of trial was $126,546.43, which equates to an average monthly income of $25,309.29. Dian testified at trial, however, that she does not take home $25,000 every month. In fact, Dian's 2012 year-to-date earnings appeared to be abnormally high, because her average monthly income based on her annual earnings in 2009, 2010, and 2011 was just over $11,000. At trial, Dian testified that her monthly expenses total $6,900 and offered an exhibit itemizing her expenses. The district court found that not all of Dian's expenses were reasonable necessities of life. However, even accepting Dian's testimony regarding her monthly income and expenses, it is clear that she has a significant disposable income. Dian argues in her brief that the trial court failed to consider the ephemeral nature of her bonus income and the prospects for future bonuses and commissions are speculative at best. We disagree.

Dian testified that she generally expects to receive a commission each month. She also admitted that more often than not she receives a quarterly bonus and that she relies on such bonus as income for herself. Although Dian may not have always earned the salary she currently earns, the record reveals that she has earned well above her base salary of $71,000 since 2009. Because she has consistently earned this additional income for a number of years, it is appropriate to consider these amounts when determining whether to award alimony. Should that

situation change, Dian may seek modification of the award at that time. See *Cole v. Cole*, 208 Neb. 562, 304 N.W.2d 398 (1981) (stating that court is to determine amount of alimony based upon evidence of conditions and circumstances existing at time of trial and if there is change, alimony award can be modified). The district court calculated Clyde's gross monthly income to be $3,602.30. At trial, Clyde testified that his monthly expenses total approximately $4,035. As such, according to Clyde, he runs a monthly shortfall of approximately $430 each month. Clyde did not itemize his expenses, however, or offer an exhibit doing so. We agree with the district court that Clyde's testimony as to his monthly expenses was, at best, vague. But we also agree with the district court's conclusion that despite the lack of evidence, Clyde will incur some reasonably necessary expenses every month such as rent, health insurance, food, and transportation. We therefore cannot conclude that the district court abused its discretion in calculating the parties' incomes and expenses for purposes of determining alimony.

Dian also argues that the district court's award of alimony is an abuse of discretion because the court failed to consider the absence of any change in Clyde's lifestyle due to the financial benefits of cohabitation. The specific statutory considerations for alimony set forth in § 42-365 do not mention the ability of the supported party to maintain a lifestyle similar to that enjoyed during the marriage, but it is a factor that may be considered. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994). Dian cites to no authority to support her position that we should consider the financial benefits of cohabitation when making an alimony determination, and we were unable to find any. We recognize, however, that the Nebraska Supreme Court has held that cohabitation, together with a showing that such arrangement improved a former spouse's financial condition, might warrant a modification of alimony. *Else v. Else*, 219 Neb. 878, 367 N.W.2d 701 (1985).

Despite this, the record in this case supports the district court's decision. There was minimal evidence presented at the dissolution trial regarding the financial benefits of Clyde's cohabitation. He testified that he paid $1,325 toward their first month's mortgage payment, but his testimony and that of his girlfriend was somewhat vague as to whether that amount would be a continuing obligation in the future. In addition, as we previously stated, we cannot analyze the reasonableness of Clyde's claimed monthly expenses because he did not identify them specifically. Regardless, we agree with the district court that going forward, Clyde will have some reasonable monthly expenses. Even if some of those expenses are shared due to his cohabitation, when considering Clyde's monthly income and the totality of the factors a court must consider when determining an award of alimony, we cannot find that the district court abused its discretion. Therefore, this argument is without merit.

The record is clear that Dian has worked hard to reach the financial success she has achieved and lives her life frugally. We understand her frustration with Clyde's lifestyle, including his continued country club membership and occupancy in his girlfriend's upscale house. But as an appellate court, we do not determine whether we would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. After reviewing the record de novo, we cannot say that the award deprives Dian of a substantial right or just result. Accordingly, we conclude that the district court did not abuse its discretion in awarding Clyde alimony in the amount of $500 for a period of 84 months.

## CONCLUSION

We find no abuse of discretion in the alimony award and affirm the decision of the district court.

AFFIRMED.