IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

RIEGEL V. LEMOND

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STEPHEN P. RIEGEL, APPELLANT,

V.

JACKIE D. LEMOND, APPELLEE.

Filed July 9, 2019.    No. A-18-607.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

Steffanie J. Garner Kotik, of Kotik & McClure Law, for appellant.

Jackie D. Lemond, pro se.

MOORE, Chief Judge, and PIRTLE and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Stephen P. Riegel appeals from a decree of dissolution entered by the district court, which decree dissolved his marriage to Jackie D. Lemond, divided the marital assets and debts, awarded Jackie legal and physical custody of the parties' minor child, and ordered Stephen to pay child support and alimony. On appeal, Stephen asserts that the district court erred in awarding Jackie sole custody of their minor child, in its calculation of his child support obligation, in awarding Jackie alimony, and in its distribution of the marital assets and debts. For the reasons set forth herein, we affirm the decision of the district court in its entirety.

## II. BACKGROUND

Stephen and Jackie were married on December 18, 1997. Two children were born of the marriage; however, by the time of the dissolution proceedings only one of their children, Ivie L., born in 2000, was still a minor.

In April 2016, Jackie moved out of the marital home. A few months later, in July 2016, Stephen filed a complaint for dissolution of marriage. In the complaint, Stephen specifically asked that the parties' marriage be dissolved; that he be awarded temporary and permanent custody of Ivie; that Jackie be ordered to pay child support; and that the marital assets and debts be equitably divided. Jackie timely filed an answer and a cross-complaint for dissolution of marriage. Therein, Jackie asked that the parties' marriage be dissolved; that she be awarded temporary and permanent custody of Ivie; that Stephen be ordered to pay child support and alimony; and that the marital assets and debts be equitably divided.

In August 2016, after a hearing, the district court entered a temporary order. In that order, the court awarded Stephen temporary legal and physical custody of the parties' oldest child (who has since reached the age of majority). The court declined to provide specific parenting time for Jackie as to this child, noting that the child "is a college student who continues to have contact with [Jackie]." The court awarded Jackie temporary legal and physical custody of Ivie. Although Jackie had requested that Stephen have no parenting time with Ivie, or, in the alternative that any parenting time between Stephen and Ivie be supervised, the district court found insufficient evidence to grant this request. The court awarded Stephen parenting time with Ivie every Wednesday evening from 5:30 to 8:30 and every other weekend beginning Friday at 5:30 p.m. and ending Sunday at 5:30 p.m. Based upon Stephen's statement that he earned $22.02 per hour and Jackie's statement that she has no income other than government assistance, the court ordered Stephen to pay temporary child support in the amount of $509 per month.

In November 2016, the district court found Jackie in willful contempt of the temporary order because "[s]he has not allowed [Stephen]'s parenting time to go forward. And she has scheduled activities for the child during [Stephen]'s parenting time." On December 2, 2016, the court sentenced Jackie to 15 days in jail. The court suspended the sentence "so long as [Jackie] complies with each and every provision relating to the Temporary Order. . . . Should [Jackie] comply for a period of six consecutive months from the date of the entry of this Order, the sentence of 15 days shall be purged." The court also modified Stephen's parenting time such that he was to see Ivie every Wednesday from the conclusion of her school day until 8:30 p.m. and every other weekend from Friday at the conclusion of school to Monday morning at the commencement of school.

A few weeks later, on December 22, 2016, the district court again modified Stephen's parenting time after hearing Ivie's testimony in chambers. Stephen was still to have parenting time every Wednesday from the conclusion of school until 8:30 p.m. However, his every other weekend parenting time was shortened such that he was to see Ivie every other Saturday from 10 a.m. until 8 p.m. and every other Sunday from noon until 8 p.m.

In April 2018, trial was held. Prior to the start of the presentation of evidence, the parties informed the district court of the contested issues. The parties agreed that the issues for the court to decide included the finalization of the property division, spousal support, custody of Ivie, and child support. However, when the court asked whether parenting time was at issue, Stephen's counsel answered, "I don't believe so. I think both parties agree that Ivie is able to make decisions on where she goes because [she is 18 years old]." When the court specifically asked Stephen if he

was not asking for specific parenting time regardless of who was awarded custody, he responded, "That is correct, Your Honor." Jackie responded similarly to the court's inquiry.

At trial, Stephen testified concerning his employment, his current financial situation, and his relationship with Ivie and Jackie. At the time of trial, Stephen was 49 years old. He testified that he is an industrial electrician. Through the local union, Stephen is able to "bid[] on" job opportunities. If he is chosen for a "union job," he earns $35 per hour. However, he is also able to obtain employment outside of the opportunities associated with the union. Stephen explained that, despite his best efforts, he has had periods of unemployment during the last few years. He provided a summary of his recent employment for the court.

Stephen testified that he was currently employed by Commonwealth Electric of the Midwest and had been so employed for the month prior to the trial, or since approximately March 2018. He testified he was earning $35 per hour, but he did not provide a paystub to support his testimony. Prior to his current job, Stephen had been employed by Omaha Electric in December 2017 and January 2018. He had earned $39 per hour for that job. Stephen indicated that he had been fired from Omaha Electric, but he did not provide the details surrounding this firing. Stephen testified that prior to his brief employment with Omaha Electric, he did not have steady employment for a period of time. When Stephen has been unemployed, he has received $408 per week in unemployment benefits. Stephen's longest period of employment in the past 20 years was when he worked for OPPD for 3 years beginning in approximately 2014. There, he earned $28 per hour. Stephen indicated that the least he has earned in any job for the last 2 years was $17 per hour.

Upon the district court's request, Stephen offered into evidence his tax returns for the 3 years immediately preceding the trial. These documents reveal that in 2015, Stephen's annual gross income totaled $66,276, or $5,523 per month. In 2016, Stephen's annual gross income, which included earned income and unemployment benefits, totaled $53,473, or $4,456 per month. In 2017, Stephen's annual gross income totaled $85,062, or $7,088.50 per month. Stephen estimated that his current monthly expenses totaled $6,043.33.

Stephen initially testified that during the marriage, he did not have a retirement account. However, upon Jackie's cross examination of Stephen, he admitted that he had a retirement account as a result of his employment with OPPD, but he had withdrawn all of the money from that account after the parties' separation. He estimated that the account had about $10,000 in it when he closed it out. An account statement admitted into evidence revealed that the actual value of the account was $11,877.57. Stephen testified that he had used this money to pay for marital debt and to pay for some of their oldest child's college expenses.

During his direct testimony, Stephen asked that he be awarded physical and legal custody of Ivie. He believed that Jackie did not provide adequate supervision or direction for Ivie. He explained that when Ivie is with Jackie, she is treated like an adult and is permitted to make her own decisions. Stephen testified that he was always the disciplinarian of the parties' children and that he wanted to ensure that Ivie is prepared to make good decisions about her future. Stephen admitted that his relationship with Ivie "has been up and down," particularly since the parties' separation; however, he believed the relationship had improved by the time of trial.

During Stephen's rebuttal testimony, his testimony about custody of Ivie changed. He indicated that he was asking for joint custody of Ivie or that Ivie be emancipated so that she could

have "full autonomy." He agreed that Ivie should choose how to divide her time between her parents. He also agreed to try to work with Jackie for Ivie's sake.

Jackie also testified concerning her employment status, her current financial situation, and her relationship with Ivie. At the time of trial, Jackie was 60 years old. She is disabled and, as a result, is unable to work. Jackie suffers from diabetes, chronic obstructive pulmonary disease, severe arthritis, high blood pressure and cholesterol, and clinical depression. She also has mobility issues. Our record indicates that she was in a wheelchair during the trial. Jackie receives $750 per month in Supplemental Security Income (SSI) as a result of her disability. This is her only source of income. Prior to the birth of the parties' oldest child, Jackie was employed doing ceramic tile work and as a custodian for a school district. Jackie testified that Stephen "insisted" that she stop working in order to stay at home with the children.

At the time of trial, Jackie was residing with the parties' two children. She and the parties' oldest child were contributing equally to the living expenses. She estimated that her monthly expenses were $1,000. She offered into evidence a deposit slip from her bank which was dated a few days prior to the start of the trial. This document indicated that Jackie had $211.08 in her bank account. In addition, Jackie testified regarding a lawsuit filed against her as a result of her failure to pay charges incurred on a credit card from a department store. Jackie indicated that she had no knowledge of the credit card or the $600 charged on the card. Stephen acknowledged that he may have charged this amount on Jackie's credit card inadvertently.

Jackie requested that she be awarded legal and physical custody of Ivie. She testified that Ivie has been doing well while in her custody. In fact, Ivie recently won an award from her high school for being the most inspirational student. Jackie indicated that Ivie does suffer from anxiety and that Ivie's "emotional state" played a large role in her decision to separate from Stephen. Jackie described Stephen as controlling, manipulative, and vindictive. Jackie believed that Ivie did not have a good relationship with Stephen.

Jackie also offered the testimony of her sister, Susan Rouch, and her son from a previous relationship, Henry Horner. Rouch testified that Ivie has a strained relationship with Stephen. She described Stephen as being a very strict and demanding parent. Rouch indicated that Ivie has "thriv[ed]" while in Jackie's custody. She was earning good grades and had recently received a national award for her artwork. Horner agreed with Rouch's testimony. He believed that Ivie had "dramatically improved" since the parties' separation. He described Ivie as laughing and smiling more. Additionally, Horner corroborated Jackie's testimony that Stephen was abusive during the marriage.

After the trial, the district court entered a decree of dissolution. In the decree, the court awarded legal and physical custody of Ivie to Jackie. Pursuant to the parties' requests, the court did not award Stephen any specific parenting time with Ivie. The court stated, "Given her age, impending graduation from high school, and the testimony of the parties, the court finds it is in Ivie's best interest that no parenting time be ordered." The court did order Stephen to pay child support in the amount of $943 per month. The court calculated this amount utilizing Stephen's average income over the 3 years preceding the trial. In addition, the court retroactively modified Stephen's temporary child support obligation, which he had been required to pay while the dissolution proceedings were pending. Based upon tax returns received at trial which evidenced

Stephen's actual income from August 2016, when the temporary order was entered, through the time of trial in April 2018, the court separately recalculated what Stephen's child support obligation should have been for August through December 2016, for all of 2017, and for January through April 2018. For each of these time periods, the court found that the amount of child support Stephen should have been paying was more than the $509 per month obligation delineated in the temporary order. The court ordered Stephen to pay $100 per month toward any arrearage due and owing.

In the decree, the district court also required Stephen to pay to Jackie $250 per month in alimony "for 240 months or until one of the following events occur: a. The death of Jackie; b. The remarriage of Jackie; or c. Further Order of the Court." The court then divided the marital assets and debts. As a result of this division, Stephen was required to pay Jackie an equalization payment of $15,500.

Stephen appeals from the decree.

## III. ASSIGNMENTS OF ERROR

On appeal, Stephen asserts that the district court erred in (1) awarding Jackie sole custody of Ivie and failing to award him any specific parenting time, (2) calculating his child support obligation and ordering him to pay retroactive child support, (3) ordering him to pay Jackie $250 per month in alimony and not ordering that this obligation end if he predeceases Jackie, and (4) its distribution of the marital assets and debts.

## IV. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, and alimony; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012); *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009); *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or its action is clearly against justice or conscience, reason, and evidence. *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005).

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Osantowski. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## V. ANALYSIS

### 1. CUSTODY

In the decree, the district court awarded Jackie sole legal and physical custody of Ivie. Because of Ivie's age, her upcoming graduation from high school, and the parties' testimony, the court did not award Stephen with any specific parenting time. Instead, the court permitted Ivie to

make her own decisions about how to divide her time between her parents. On appeal, Stephen asserts that the district court abused its discretion in awarding Jackie sole custody of Ivie. Stephen asserts that the court should have awarded him sole custody, "or at the very least," the parties should have been awarded joint custody. Brief for appellant at 16. In addition, Stephen asserts that the court should have provided him with specific parenting time with Ivie. Upon our review, we find that Stephen's assertions are not supported by the evidence.

In an action for dissolution of marriage involving the custody of minor children, the court is required to make a determination of legal and physical custody based upon the children's best interests. Neb. Rev. Stat. § 42-364(1)(b) (Reissue 2016). The court may grant the parties joint legal custody or joint physical custody, or both, if either (a) both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the children or (b) the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor children regardless of any parental agreement or consent. § 42-364(3).

The standard for determining custody is parental fitness and the child's best interests. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). Nebraska's Parenting Act states that it is in the best interests of the child to have a "safe, stable, and nurturing environment." See Neb. Rev. Stat. § 43-2921 (Reissue 2016). To determine the best interests of a child, a court must consider, at a minimum: (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). Other pertinent factors a court may consider in determining the best interests of a child include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

In his brief on appeal, Stephen asserts that the district court abused its discretion in awarding Jackie sole legal and physical custody of Ivie because he "provided the more credible evidence with respect to all factors the court is to look to when making a custody determination." Brief for appellant at 15. Stephen also asserts, "The evidence presented shows that Stephen is a loving and caring father who has a wonderful relationship with Ivie and has the ability to provide for Ivie's physical care and safety." *Id*.

Contrary to Stephen's assertions on appeal, there was conflicting evidence presented at trial regarding Stephen's relationship with Ivie and Ivie's best interests going forward. While Stephen testified that his relationship with Ivie had improved during the pendency of the dissolution proceedings, Jackie testified that Stephen and Ivie continued to struggle in their relationship. Stephen testified that Jackie was not providing Ivie with appropriate parental control or support and was, instead, allowing Ivie to make important, adult decisions for herself. To the

contrary, Jackie presented evidence which demonstrated that Ivie was flourishing in Jackie's care. She was earning good grades and was also earning awards for both her artwork and her positive attitude. Ivie was also described as much happier than she had been during her parents' marriage. While Jackie admitted that Ivie had been suffering from anxiety and other emotional problems, Jackie attributed these issues to Ivie's relationship with Stephen and to Ivie's observations of Jackie's relationship with Stephen.

In his rebuttal testimony, Stephen indicated his willingness to try to work together with Jackie if they were awarded joint custody of Ivie. However, the overwhelming evidence presented by both parties indicated that they do not communicate well with each other and are not able to work together. The animosity between the parties is probably best evidenced by the contempt hearing held while the dissolution proceedings were pending. Stephen and Jackie were unable to work together, outside of the courtroom, to address the situation with Ivie. Moreover, both parties testified about a lack of trust with each other.

Because the district court awarded Jackie sole legal and physical custody of Ivie, it clearly found Jackie's evidence in this regard to be more credible than Stephen's evidence. And, as we stated above, where the evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Osantowski v. Osantowski, supra*. Given our reading of the record, and given our deference to the trial court's decisions about witness' credibility, we cannot say that the district court abused its discretion in awarding Jackie sole legal and physical custody of Ivie, rather than awarding Stephen sole custody or awarding the parties joint custody.

In his brief on appeal, Stephen also asserts that the district court erred in failing to award him specific parenting time with Ivie, and instead, leaving the decision about when to see him in Ivie's control. We first note that prior to the start of the presentation of evidence at trial, both Stephen and Jackie explicitly indicated to the court that given that Ivie was 18 years old and about to graduate from high school, Ivie was capable of making decisions about how to divide her time between her parents. Stephen informed the court that he was not asking for any parenting time regardless of the court's decision regarding custody. Additionally, in his rebuttal testimony, Stephen indicated his belief that Ivie should have "full autonomy" and be able to make her own decisions. Given Stephen's posture both before and during the trial, it seems disingenuous for him to now argue that the court erred in failing to order specific parenting time. This is precisely what he asked the court to do.

Despite Stephen's change of heart about this issue, we have reviewed the district court's decision to not award Stephen with any specific parenting time. We cannot say that this decision is an abuse of discretion. At the time of the trial, Ivie was 18 years old and a month away from her high school graduation. Although both Stephen and Jackie testified that Ivie had not yet decided what to do and where to live after her graduation, it is entirely possible that she will choose to live apart from both of her parents. At the very least, the evidence presented at trial demonstrated that Ivie is capable of deciding when to spend time with each of her parents. We affirm the decision of the district court which awarded Jackie sole legal and physical custody of Ivie and which did not award Stephen any specific parenting time.

## 2. CHILD SUPPORT

In the decree, the district court ordered Stephen to pay $943 per month in child support. In determining Stephen's child support obligation, the court calculated Stephen's income by utilizing his tax returns to average his annual income from the 3 years preceding the trial. The court determined that Stephen's gross monthly income for child support purposes was $5,689. Although Stephen testified at trial that he was currently earning $35 per hour and $3,000 per month, the court found this testimony to not be credible because Stephen failed to submit a paystub into evidence and because he had previously under-reported his income to the district court.

Additionally, the district court ordered Stephen to pay retroactive child support for the period when the dissolution proceedings were pending. The court found that Stephen's tax returns from 2015, 2016, and 2017 "reveal[ed] that both Stephen's earning capacity and actual earnings significantly exceeded that which he reported when his temporary child support was set." Because of this discrepancy, the court recalculated Stephen's temporary child support obligation from August 1 through December 31, 2016, to be $640, rather than the $509 per month ordered in the temporary order. Similarly, the court recalculated Stephen's temporary child support obligation for 2017 to be $801 per month from January through June, when the parties' oldest son turned 19, and to be $1,098, from July through December, when Stephen no longer had custody of one of the parties' children. The court also ordered that Stephen's child support from January 2018 through the time of trial in April 2018 be $943, instead of the $509 per month previously ordered. According to our calculations, Stephen was ordered to pay $7,677 in arrearages. Stephen was to pay $100 per month toward his arrearages, in addition to his current child support obligation. The court further ordered that when Stephen's current child support obligation is no longer owed for Ivie (due to her attaining the age of 19), Stephen shall continue to pay $943 per month until his child support arrearage is paid in full.

On appeal, Stephen asserts that the district court erred in calculating his income for child support purposes. He argues that the court should have taken into account his testimony that his continued employment with his current job "is not a guarantee." He also argues that the court should not have calculated his income using an average of his annual income for the last 3 years. Stephen also asserts that the district court erred in ordering him to pay retroactive child support for the period when the dissolution proceedings were pending. He argues that he has no ability to pay the retroactive support.

### (a) Income for Child Support Purposes

The district court calculated Stephen's current income for child support purposes by averaging Stephen's annual income for the 3 years preceding the trial, as it was reported in his tax returns. According to the court's calculations, Stephen's average monthly income for the 3 years preceding the trial totaled $5,689. Contrary to the district court's calculations, Stephen testified at trial that at the time of trial, he only earned $3,000 per month. The district court explicitly found Stephen's testimony regarding his current income to not be credible. And, while we defer to the trial court's determinations of witness credibility, see *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002), we also note that there is evidence in the record to support the court's determination. It is clear that Stephen misstated his income at the time of the temporary hearing

because his tax returns demonstrate that he was earning considerably more than he reported to the court. Moreover, despite the district court's requests, Stephen failed to offer into evidence a paystub from his current place of employment. Since, arguably, such documentation should have been easy for Stephen to obtain, we can infer that Stephen's oversight was intentional.

The Nebraska Child Support Guidelines provide that for purposes of assessing a party's total monthly income, "[c]opies of at least 2 years' tax returns, financial statements, and current wage stubs should be furnished to the court and the other party. . . ." Neb. Ct. R. § 4-204. Here, Stephen failed to provide the court with a copy of his current wage stubs as is required by the child support guidelines. Given Stephen's failure to provide this documentation and given the court's finding that Stephen's testimony about his current income was not credible, the only credible information about Stephen's income before the court was his tax returns for the 3 years preceding the trial.

The child support guidelines indicate, "If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities." See Neb. Ct. R. § 4-204. The district court indicated that it was basing Stephen's child support obligation on "a 3-year average . . . and/or [his] earning capacity," as was demonstrated by his tax returns. Given the lack of any other credible evidence regarding Stephen's income at the time of trial, we cannot say that the district court abused its discretion in its calculation of Stephen's monthly income for child support purposes.

(b) Retroactive Child Support

The district court ordered Stephen to pay retroactive child support for the period when the dissolution proceedings were pending after the court discovered that Stephen had misled the court about his income at the time of the August 2016 temporary hearing. While Stephen indicated in his affidavit that he submitted to the court at the temporary hearing that he earned only $22 per hour, his 2016 tax returns which he submitted at trial revealed that Stephen made significantly more than $22 per hour. In fact, those tax returns indicate that he earned $4,456 in gross monthly income in 2016, which equates to much more than $22 per hour. Similarly, Stephen's tax returns from 2017 indicate he earned much more than $22 per hour and that he should have been paying more in temporary child support while the dissolution proceedings were pending. We also note that the evidence presented at trial revealed that Stephen failed to stay current with the already insufficient amount of child support he was ordered to pay in the temporary order.

In his brief on appeal, Stephen does not challenge that portion of the district court's order which calculated the amount of retroactive child support he owed. Rather, he challenges the district court's finding that he has the ability to pay retroactive child support given his financial circumstances and his other obligations. The ability to pay is an important factor in determining retroactive child support. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). And in the absence of a showing of bad faith, it is an abuse of discretion for a court to award retroactive child support when the evidence shows the obligated parent does not have the ability to pay the retroactive support and still meet current obligations. *Id.*

The district court ordered Stephen to pay $100 per month toward his arrearage in addition to his current child support payment of $943 as long as Ivie is a minor. Once Ivie reaches the age

of majority, Stephen is to pay $943 per month toward the arrearage until it is paid off. Given that the arrearage totals $7,677, even if Stephen did not pay any money toward the arrearages while Ivie remained a minor, he would have to pay only about eight additional months of child support to pay off the arrearage. Upon our review of the record, we find that Stephen has the ability to pay retroactive child support. The district court calculated Stephen's current monthly income to be $5,689 per month. After subtracting his monthly child support obligation, his $100 payment toward his child support arrearage, and his $250 alimony payment, Stephen has $4,396 left per month for his personal needs and expenses. This amount is still more than double Jackie's monthly income, after taking into account the amount of child support and alimony she is to receive. We note that Stephen was also ordered to pay a $15,500 equalization payment to Jackie. However, Stephen was awarded a vast majority of the parties' assets. Based on all of the evidence regarding Stephen's financial circumstances, we do not find that the district court abused its discretion in finding he is capable of paying retroactive child support.

Moreover, we find that there is evidence that Stephen acted in bad faith in reporting his income to the district court at the August 2016 temporary hearing. But for Stephen's untruthful statements in his affidavit regarding his income, Stephen would not have to pay retroactive child support. Because of Stephen's act of bad faith and his ability to pay, we affirm the decision of the district court which ordered Stephen to pay retroactive child support for the period of time after the entry of the temporary order through the entry of the district court's decree.

### 3. ALIMONY

During Jackie's trial testimony, she requested that the district court award her only $250 per month in alimony. She explained that in order for her to continue receiving Medicaid benefits, she cannot receive any more than $250 per month in alimony. She testified that due to her "exuberant" medical bills, she has to stay on Medicaid. Jackie acknowledged that if she were awarded $250 per month in alimony, her SSI benefits would be reduced such that her net gain from the alimony payment would only be $50 per month. Specifically, with the alimony payments, Jackie's monthly income would increase to $800 from $750 per month. However, Jackie indicated that, given her low income, that $50 was important to her.

In the decree, the district court awarded Jackie $250 per month in alimony pursuant to her request. The court ordered that Stephen was to pay the $250 per month in alimony for 240 months or until Jackie's death, Jackie's remarriage, or further order of the court. The court stated:

> The duration of spousal support ordered is reasonable under the circumstances of this case. Specifically, this is a long term marriage. The amount of monthly support being ordered is low. Stephen's earning capacity far exceeds Jackie's. Jackie is disabled. She has little, if any, ability to increase her income or earning capacity. The parties agreed Jackie would be a stay at home wife and mother. She did that. She has no retirement account, pension, savings account, or investments.

On appeal, Stephen challenges the district court's award of alimony. First, Stephen asserts that the court erred in awarding Jackie any alimony because such award simply decreases her SSI benefits and fails to generate a significant increase in her income. Stephen argues that ordering

him to pay alimony to Jackie under these circumstances is punitive. Second, Stephen asserts that the district court erred in failing to terminate his alimony obligation upon his death.

(a) Decision to Award Any Alimony

In awarding alimony, a court should consider, in addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), the income and earning capacity of each party as well as the general equities of each situation. *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004). The criteria in § 42-365 include

> the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party. . . . The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate.

In considering the specific criteria of § 42-365 concerning an award of alimony, a court's "polestar" must be "fairness and reasonableness as determined by the facts of each case." *Meints v. Meints*, 258 Neb. 1017, 1022, 608 N.W.2d 564, 568 (2000). Stated another way, in determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is reasonableness. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000).

As the district court noted, Stephen and Jackie's marriage was one of long duration. The record reflects that they were married for more than 20 years. During the marriage, Stephen attended school and received a degree in energy generation. He has used this degree to work as an industrial electrician. While he did not always have steady employment, the evidence presented at trial revealed that Stephen was the primary financial provider for the family. At the time of trial, Stephen testified that he was earning $35 per hour at his current job. As we discussed above, the district court calculated Stephen's gross monthly income to be more than $5,500.

Shortly after the parties married, Jackie gave up her employment in order to be a stay at home mother for the parties' two children. Since giving birth to the children, Jackie has become disabled, suffering from numerous health and mobility problems. She is unable to work and as the district court found, "has little, if any, ability to increase her income or earning capacity." By the time of the trial, Jackie received $750 per month in social security benefits. This was her only income besides any child support she received from Stephen for Ivie. Jackie asked the district court to award her only $250 per month in alimony so that she could keep her Medicaid benefits. Jackie acknowledged that, due to the interplay of her government benefits with a $250 monthly alimony award, that her income would only be increased by $50 per month to $800. However, Jackie also testified that given her limited resources, the extra $50 per month was a significant amount.

Given the evidence presented at trial regarding the parties' contributions to the marriage, the significant difference in their incomes and earning potential, and Jackie's serious health problems, we do not find that the district court abused its discretion in awarding Jackie $250 per

month in alimony for a period of 240 months. The amount awarded to Jackie was reasonable under the circumstances of this case. We do not agree with Stephen's assertion that the district court was punishing him by awarding Jackie alimony. Although the alimony awarded to Jackie may not increase her income by much, the increase is significant to her and will assist her in paying her monthly expenses. Stephen earns more than five times what Jackie earns every month. The amount of alimony he is required to pay is well within his means. We note that disparity in income or potential income may partially justify an award of alimony. *Hosack v. Hosack*, 267 Neb. 934, 678 N.W.2d 746 (2004).

(b) Not Terminating Alimony at Stephen's Death

Stephen also argues that the district court abused its discretion in failing to order that his obligation to pay alimony to Jackie would not terminate upon his death. He asserts that there is nothing in his or Jackie's circumstances that would support a departure from the default provisions of § 42-365, and he maintains that the district court's provisions are "unreasonably harsh and burdensome." Brief for appellant at 22.

Section 42-365 states in part, "Except as otherwise agreed by the parties in writing or by order of the court, alimony orders shall terminate upon the death of either party or the remarriage of the recipient." The statute specifically allows a court to determine "by order of the court" that an alimony award will not "terminate upon the death of either party or the remarriage of the recipient." Here, the district court ordered that Stephen's alimony obligation would terminate upon the death or remarriage of Jackie or upon further order of the court. As a result, the court implicitly ordered Stephen's alimony obligation to continue in the event of his death.

Although § 42-365 lists specific circumstances which are to be considered in making any alimony award, it does not provide specific guidance for determining when it is appropriate for a court to determine that such award will not terminate on the parties' deaths or the recipient's remarriage. However, the Nebraska Supreme Court and this court have found certain circumstances significant in cases with similar termination provisions.

Serious health problems experienced by either party may support an award of alimony which does not terminate according to the default provisions of § 42-365. For example, in *Cole v. Cole*, 208 Neb. 562, 304 N.W.2d 398 (1981), this court modified an alimony award to provide $800 per month for 25 years and ordered that the award would not terminate on the obligor spouse's death. In that case, the recipient spouse had been seriously injured while riding as a passenger on a motorcycle. She was paralyzed from the chest down and had only partial use of her arms and hands. Similarly, in *Hafer v. Hafer*, 3 Neb. App. 129, 524 N.W.2d 65 (1994), the recipient spouse contracted multiple sclerosis during the marriage and, as a result, was completely unemployable. This court determined that the recipient spouse should receive an alimony award of $300 per month until the death of either party. The court specifically found that "[t]his award of alimony is not to terminate automatically upon the remarriage of the [recipient spouse]." *Id.* at 137, 524 N.W.2d at 71.

Another circumstance which may support a trial court's decision to vary the termination provisions of § 42-365 is the recipient spouse's inability to work or improve his or her earning capacity. See, e.g., *Hafer v. Hafer, supra* (recipient spouse unemployable because of multiple

sclerosis). See, also, *Bauerle v. Bauerle*, 263 Neb. 881, 644 N.W.2d 128 (2002) (providing more extensive list of factors to consider in ordering that alimony will not terminate upon remarriage or upon death of either party).

In the present case, the district court did not specifically indicate the basis for its determination that Stephen's alimony should not terminate upon his death. However, the record clearly reveals that Jackie suffers from serious health problems which have rendered her disabled and unable to work or to improve her current financial circumstances. Given the evidence of Jackie's persistent physical limitations and her inability to obtain gainful employment, in addition to the limited amount of alimony awarded to Jackie, we cannot say that the district court abused its discretion in departing from the default termination provisions of § 42-365. Accordingly, we affirm the district court's decision that Stephen's alimony obligation will terminate upon Jackie's death or remarriage or upon further order of the court, but will not terminate upon his death.

### 4. DIVISION OF MARITAL ESTATE

In his brief on appeal, Stephen asserts that the district court erred in various ways in calculating and distributing the marital estate. We address each of Stephen's arguments in turn, but first we repeat the law which overlays all of his assertions.

Under § 42-365, the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008).

Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006). Section 42-365 provides, "The purpose of a property division is to distribute the marital assets equitably between the parties." That statutory section also indicates that in dividing the marital estate, a court should consider such things as the circumstances of the parties; the duration of the marriage; and the history of the contributions to the marriage by each party, including contributions to the care and education of the children and interruption of personal careers or educational opportunities.

### (a) Stephen's Inheritance

During his trial testimony, Stephen testified that he had inherited approximately $30,000 from his mother's estate. He indicated that he had used this inheritance to pay for 75 percent of the $40,000 purchase price of the marital home. As such, Stephen asserted that 75 percent of the value of the marital home should be awarded to him as nonmarital property. Stephen testified that at the time of the trial, the marital home was only worth $17,300. He offered into evidence a printout from the website of the Lancaster County Assessor to support his testimony regarding the value of the home. During her testimony, Jackie agreed that Stephen used some of his inheritance money to pay for the marital home. She estimated that he used $26,000 of the inheritance toward this expense.

Jackie also testified that she had received a significant inheritance from her parents during the marriage, totaling approximately $35,000. She testified that the parties had used this money to pay off marital debt, to purchase a vehicle, and for living expenses for a period of time. Neither Stephen nor Jackie submitted any documentation to prove the exact value of their inheritances, where the money was deposited, or how the inheritance money was spent.

In the decree, the district court found, "Neither party met his/her burden of proof that any portion of his/her claimed inheritance or any alleged assets purchased therewith should be set aside as his/her nonmarital property." In so finding, the court indicated that Stephen's testimony about his inheritance was not credible and that Jackie's testimony about her inheritance was problematic because it was clear that "she was not privy to the parties' finances" during the marriage. On appeal, Stephen asserts that the district court erred in failing to find that 75 percent of the value of the marital home was his nonmarital property because he had used his inheritance to pay for that proportion of the home.

As a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Westwood v. Darnell*, 299 Neb. 612, 909 N.W.2d 645 (2018). Exceptions to the rule that all property accumulated and acquired during the marriage is marital property includes property accumulated and acquired through gift or inheritance. *Id*. The burden of proof rests with the party claiming that property is nonmarital. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id*. Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017).

Stephen contends that he utilized a $30,000 inheritance to pay for 75 percent of the parties' marital home. The problem with Stephen's claim is that it is based solely on his own recollection. Stephen failed to adduce any documentation whatsoever regarding the amount of his inheritance, the purchase price of the marital home, or where the funds to purchase the marital home originated from.

In *Onstot v. Onstot*, 298 Neb. 897, 906 N.W.2d 300 (2018), the husband testified that he purchased the family home 9 years prior to the marriage. He testified to the purchase price and what he believed to be the amount of the original mortgage. He then testified to what he believed to be the value of the home on the date of marriage but provided no evidence regarding the balance of the mortgage at that time. No documentation was provided to confirm his testimony regarding the date of purchase, the purchase price, the amount of the mortgage, or the value of the house at the time of the marriage. The Supreme Court found that the equity in the residence at the time of the parties' marriage would be a nonmarital asset, which, if established, should be set aside to the husband. However, given the lack of documentation that any equity existed at the time of the parties' marriage, the Supreme Court found that the husband failed to meet his burden of proving that the property was a nonmarital asset. *Id.*

Just as in *Onstot v. Onstot, supra*, Stephen's testimony, standing alone, is insufficient to definitively demonstrate the value of his inheritance, the purchase price of the marital home, or whether his inheritance was utilized to purchase the marital home. We recognize that contrary to

the facts in *Onstot*, at trial Jackie specifically testified that Stephen utilized approximately $26,000 of his inheritance to purchase the marital home. Given Jackie's concession that Stephen paid $26,000 toward the marital home out of his inheritance, we could find that a portion of the marital home should be set aside as Stephen's nonmarital property. However, Stephen failed to sufficiently prove the purchase price of the marital home, and thus failed to prove what percentage of the marital home his inheritance paid for. He testified that the purchase price was approximately $40,000. Jackie did not explicitly contest Stephen's testimony as to the purchase price, but we note that the district court specifically found that Jackie was not privy to the parties' finances during the marriage.

Ultimately, we must affirm the district court's decision that Stephen failed to meet his burden of proof in establishing that any portion of the current value of the marital home should be set aside as his nonmarital property. While Jackie's testimony supports Stephen's assertion that he used at least $26,000 of his inheritance to purchase the marital property, we do not have any documentation or other evidence, besides Stephen's testimony, to prove the purchase price of the marital home. Because we do not know the purchase price, we are unable to calculate what portion of the marital home was purchased with Stephen's inheritance and, thus are unable to calculate what percentage of the current value of the home should be set aside as Stephen's nonmarital property. Given Stephen's failure of proof, we affirm the decision of the district court which found the entirety of the current value of the marital home to constitute marital property.

(b) Stephen's Student Loans

Evidence presented at trial revealed that, while the parties were still married, Stephen attended school and received a degree in "energy generation." As a result of attending school, Stephen acquired student loan debt. Stephen testified that the money from his student loans was used to pay for his classes and for administrative fees. He further testified that some of the money "went towards feeding my family, keeping the lights on and keeping everybody fed." Stephen indicated that the outstanding student loan debt at the time of trial totaled approximately $6,700. He did not provide documentation to support his testimony. In addition, he did not provide a break down to establish how much of the student loan debt went toward his education and how much went toward caring for his family. Stephen noted in an exhibit offered at trial that his student loan debt is currently being deferred. In the decree, the district court ordered that "Stephen is responsible for his student loan debt and it will not be factored into the overall property division." On appeal, Stephen asserts that the district court erred in failing to treat his student loan debt as a marital debt because the debt was acquired during the marriage and because some of the loan money was used to support the parties' family.

We agree with the finding of the district court that Stephen failed to adequately establish the amount of any student loan debt he incurred during the marriage. Stephen did not submit any documentation regarding the value of his outstanding student loan debt. He provided only his own recollection of the amount of debt he still owed. Moreover, Stephen failed to provide any sort of accounting for how the student loans were utilized during the marriage. While he asserts that some of the money went toward supporting his family while he attended school, he does not provide any specific calculation for what portion of the loan went toward this type of expense.

As Stephen notes in his appellate brief, in *Walker v. Walker*, 9 Neb. App. 694, 618 N.W.2d 465 (2000), this court found that it was not an abuse of discretion to find student loan debt to be nonmarital due to the fact that the obligor took with her all of the benefits of her law school education. Given this holding, it is important that an obligor present an adequate record establishing how a student loan incurred during the marriage was utilized. If the loan was utilized solely for educational expenses, then, arguably, the debt could be found to be nonmarital property. However, if part of the loan was utilized for the support of the obligor's family, then such loan could arguably be found to be marital. Here, not only did Stephen fail to sufficiently prove the amount of outstanding student loan debt, he failed to provide an itemization to establish how any student loan acquired during the marriage was utilized. Given Stephen's failure of proof, we affirm the decision of the district court to not factor the student loan debt into the overall property division.

(c) Marital Debt

At trial, Stephen submitted into evidence a list of debts that he claimed should be treated as marital debts and calculated into the marital estate. These debts included, medical bills, outstanding credit card charges, student loans for the parties' oldest child, loans taken out against the parties' four vehicles, and an outstanding bill for a new furnace for the marital home. At the end of the first day of trial, the district court asked that Stephen return to the second day of trial (scheduled for 4 days later) with "account statements from the time of the separation, April 2016 through today's date." On the second day of trial, Stephen appeared late, and without any of the account statements requested by the court. Stephen told the court, "Those documents couldn't be produced in the time frame that you gave me."

During Jackie's testimony, she acknowledged the existence of certain medical bills which were incurred prior to the parties' separation on behalf of the parties' children. However, she seemed to dispute whether such bills had previously been paid. In addition, in an exhibit submitted into evidence by Jackie, she concedes that the parties had outstanding debt for loans taken out to purchase four vehicles. Jackie indicated that she had no knowledge regarding any other marital debts.

In the decree, the district court included only five of the debts described by Stephen into the calculation of the marital estate. These debts included a loan for the new furnace, which Stephen testified had been incurred prior to the parties' separation; the loans taken out against the parties' vehicles, which Jackie had acknowledged; and two medical bills which were for care received by the parties' children prior to the separation. Stephen was ordered to pay these debts. The court also found that the outstanding charges on a department store credit card in Jackie's name was a marital debt. The court ordered Jackie to pay this debt.

The remaining debt which Stephen alleged to be marital was not included in the district court's calculation of the marital estate. The court indicated its finding that the following debts were incurred postseparation and were, therefore, not marital: debt owed to a doctor for treatment provided to the parties' oldest child; debt owed to a psychiatric clinic; student loans paid for the benefit of the parties' oldest child; and debt owed to an electronic store for purchases made on a credit card. The court found that the following debts were incurred preseparation and postseparation, but Stephen failed to sufficiently prove how much debt was acquired preseparation

- 16 -

and how much debt was acquired postseparation: debt owed to a chiropractor for treatment of Stephen and credit card debt owed to four separate retail establishments. Stephen appeals the district court's categorization of the debt.

A marital debt is defined as a debt incurred during the marriage and before the date of separation, by either spouse or both spouses, for the joint benefit of the parties. *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 823 N.W.2d 697 (2012). Any increase in debt that occurred after the parties' separation is not for the joint benefit of the parties and should not be considered marital debt. See *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018).

Upon our review, we find no abuse of discretion in the district court's categorization or division of debt. We note that, like the district court, our review of the overall division of property is significantly constrained by the parties' failure to provide documentation to support their positions as to the value, or existence, of both marital assets and liabilities. In this case, the evidence indicates that Stephen was in control of the parties' financial records. However, despite the specific request of the district court, he failed to produce documentation to prove either the existence or value of the debts he claimed to be marital. Instead, he provided only generalized testimony regarding his beliefs about the amount of outstanding debt and about whether such debt was incurred preseparation or postseparation.

Notwithstanding the lack of documentation to prove any of the alleged marital debt claimed by Stephen, the district court did include the debt incurred for the parties' vehicles; for a new furnace; and for certain medical bills for the parties' children in the marital estate. Neither party contests the district court's categorization or valuation of these marital debts. And, given our review of the record, we do not find that the district court abused its discretion in its treatment of these debts. Jackie acknowledged the debts for the parties' vehicles and for the children's medical bills. Stephen definitively testified that the loan to purchase a new furnace was incurred preseparation. Jackie did not dispute this.

Stephen failed to present sufficient evidence to prove either the value or the date of the remaining debts he claimed to be marital. As to the credit card debt owed to four separate retail establishments, Stephen's testimony appeared to indicate that he had used each of the credit cards both before and after the time the parties' had separated. Stephen could not provide specific information regarding how much debt was acquired on the credit cards prior to the separation and how much was acquired after. In addition, Stephen specifically testified that he had not obtained the credit card to the electronics store until after the parties' separation. Stephen testified that the debt owed to his chiropractor was incurred both before and after the parties' separation. He indicated that while he believed most of the debt was incurred prior to the separation, he had not "grilled them on what might be after." Stephen admitted that certain medical bills and student loans incurred for the benefit of the parties' oldest child were incurred after the parties' separation. Given Stephen's testimony regarding the claimed marital debt and given the lack of documentation to support his assertions regarding the categorization and valuation of such debt, we do not find that the district court erred in excluding these debts from its calculation of the marital estate.

### (d) Retirement Account and Tax Returns

As we discussed above, Stephen testified at trial that after the parties' separation he had withdrawn almost $12,000 from a retirement account that had been acquired during the parties' marriage. He indicated that he had used this money to pay for various expenses, but he was unable to provide specifics. In the decree, the district court found that the retirement account was a marital asset. It allocated this asset to Stephen. Similarly, the district court found that the value of the parties' $3,884 tax refunds from their jointly filed 2016 taxes was a marital asset. It awarded Stephen this money. On appeal, Stephen argues that the district court erred in finding both the retirement funds and the tax refunds to be marital assets because he used this money to pay bills he had become "solely responsible for" after Jackie moved out of the marital residence. Brief for appellant at 27.

We find that the district court did not abuse its discretion in finding the retirement funds and the tax refunds to be marital assets. The evidence presented at trial revealed that this money was acquired during the parties' marriage. The evidence also revealed that, after the parties' separation, Stephen utilized these funds to pay his bills and other expenses. Jackie was, apparently, unaware that Stephen was spending these marital funds.

### (e) Division of Marital Estate

In the decree, the district court ordered Stephen to pay an equalization payment to Jackie in the amount of $15,500. The court noted that "[t]his judgment results in Jackie receiving more than 50% of the marital estate . . . said division is fair and reasonable and appropriate." In fact, according to our calculations, Jackie received approximately 56 percent of the marital estate. On appeal, Stephen asserts that the district court abused its discretion in dividing the marital estate. Upon our review, we do not agree with Stephen's assertion. Given the parties' relative financial circumstances, including Jackie's inability to engage in gainful employment, and given that Jackie was awarded minimal alimony and tangible property, we do not find that the district court abused its discretion in awarding Jackie slightly more than 50 percent of the marital estate. Such an award is fair and reasonable given the specific facts of this case.

### VI. CONCLUSION

Upon our review of the record, we find that the district court did not abuse its discretion in awarding Jackie sole custody of Ivie, in its calculation of Stephen's child support obligation, in its decision to order Stephen to pay increased child support retroactive to the entry of the temporary order, in its award of alimony, or in its calculation or division of the marital estate. Accordingly, we affirm the decision of the district court in its entirety.

AFFIRMED.