IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

DONAHOE V. DONAHOE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LISA K. DONAHOE, APPELLEE AND CROSS-APPELLANT,

V.

EDWARD K. DONAHOE, APPELLANT AND CROSS-APPELLEE.

Filed January 14, 2020.    No. A-19-105.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Andrew M. Ferguson, of Govier, Katskee, Suing & Maxell, P.C., L.L.O., for appellant.

Joan Watke Stacy, of Sena, Polk & Stacy, L.L.O., for appellee.

PIRTLE, RIEDMANN, and WELCH, Judges.

WELCH, Judge.

I. INTRODUCTION

Edward K. Donahoe appeals, and Lisa K. Donahoe cross-appeals, the decree entered by the Douglas County District Court dissolving their marriage. Edward assigns error to the court's determination of his annual income, the valuation of his business, his child support obligation, his spousal support obligation, the attorney fee award, his tax payment obligation, and his equalization payment. Lisa assigns error to the court's failure to award her sole legal custody of the parties' minor child and failure to award her retroactive child support. Based upon the analysis set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

Edward and Lisa were married in November 1992. Two children were born during the marriage, but only one child, Drake, was a minor at the time of trial. Lisa filed for dissolution of the parties' marriage in June 2016.

### 1. PRE-TRIAL ORDERS

In August 2016, the district court entered a temporary order stating:

That neither party shall be ordered to pay the other party child support at this time; however the parties should be and are hereby order[ed] to pay fifty percent (50%) of the direct expenditures incurred on behalf of the parties' minor children including, but not limited to, clothing, school lunches, and extracurricular activities. . . .

That the issue of child support should be and is hereby preserved until the final hearing so that the parties can exchange income information. That any order for child support shall be retroactive to the first day of August, 2016. . . .

That the Court orders that the parties sell their marital residence; that each of the parties should be and is hereby ordered to immediately list the marital residence for sale with a licensed realtor.

In December 2016, the first temporary order was modified by a second temporary order. The second temporary order noted that Edward had previously been ordered to provide discovery responses and had failed to do so within the required time period. The court ordered Edward to fully respond to Lisa's interrogatories and request for production of documents and ordered Edward to pay $500 toward Lisa's attorney fees. The court further ordered Edward to pay spousal support in the amount of $750 per month until further order of the court. The second temporary order further provided, in relevant part:

[Edward] should be and is hereby ordered to continue to pay the joint expenses of the parties from his business account as he has in the past, including [Lisa's] car payment and car insurance, Synchrony Bank loan, Dalton's car payment and car insurance, the children's extracurricular activities, and children's clothing until further order of the Court.

. . . .

. . . That all other terms of the Temporary Order previously entered herein on the 29th day of August, 2016, not specifically modified herein, shall remain in full force and effect.

In a third temporary order filed in March 2017, the district court noted that Edward had failed to pay the attorney fees awarded in the second temporary order, granted Lisa's motion for sanctions, and ordered Edward to pay $1,000 toward Lisa's attorney fees. The court again ordered Edward to fully respond to Lisa's first set of interrogatories and requests for production of documents.

### 2. TRIAL

Trial was held in October 2018. At trial, witnesses testifying on Lisa's behalf included herself and Zachary Ahlf, an accountant who was federally licensed to practice as an "Enrolled

Agent." Witnesses testifying on Edward's behalf included himself and Frank Haverkamp, an attorney and owner of a business brokerage company.

The evidence established that Edward is self-employed and the sole owner of Great Plains Sports Flooring, LLC ("Great Plains"). Great Plains does not have any employees. From 2013 to 2018, Lisa worked as a teacher. The record is unclear as to Lisa's employment history prior to 2013.

Edward testified that, in 2015, his gross income was $78,000; however, because he had to pay $15,000 in taxes that year, his income was approximately $60,000, or $5,000 per month. Edward testified that he believed his tax returns were accurate and that the parties' 2015 tax return showed that Edward made $58,000 and Lisa made $52,000.

Lisa moved out of the marital home in October 2016. Edward testified that when she moved out, Lisa took some of the furniture, such as beds, for the boys to use at her residence, requiring Edward to purchase $3,064.35 of furniture to replace the items. Edward also acknowledged that the same amount, $3,064.35, appeared on his 2016 corporate tax return as furniture on form 4562 Depreciation and Amortization. Edward also acknowledged that the court ordered him to list the marital home for sale, but stated that he did not do so because that was not agreed upon between himself and Lisa.

Lisa testified at trial that despite the court's orders requiring Edward to produce discovery, he had yet to produce all of the discovery that she requested. She further testified that the trial court had issued the second temporary order which directed Edward to pay a bill to Pacesetters, which is one of Drake's baseball teams, but as of the time of the trial, Edward had not paid the team. Edward testified that he worked out a payment plan with the team.

Lisa testified that she and Edward agreed to joint legal custody during mediation in June 2016. During the trial, Lisa relied on her calendar and explained that to that point, Edward had 242 parenting days, but during 73 of those nights, Lisa had one or both of the boys. Lisa further testified that 11 of the 73 nights were days that Edward had to travel out of town for work. Lisa also testified that she has had to take Drake an additional four times per month during Edward's parenting time.

Lisa further testified that up until the time of trial, she has provided Edward's health insurance, including vision and dental, costing her just under $300 per month. Lisa also testified that she provided medical insurance for the parties' children, including the parties' oldest child while he was still a minor.

Edward testified the communication between himself and Lisa has improved since the initial filing for dissolution. He further testified that he and Lisa worked together to find a counselor for Drake to help process his feelings about the divorce.

Lisa, however, testified that communication between herself and Edward is strained. Lisa testified Edward refuses to communicate with her regarding Drake's baseball activities. More specifically, Lisa testified that when she asks Edward for that information, he either does not reply or responds with "fuck you." Lisa further testified about the harassing behavior Edward exhibited when communicating with her. Lisa testified about Edward entering her residence on more than one occasion, even though she had exclusive possession of it. Lisa described how Edward pays spousal support by explaining he never tells her when he is coming over despite her asking him for a time, and he sometimes leaves a check in her mailbox or pushes the check through her door so it is laying on the floor, which "freaked" her out.

Lisa also testified that Edward made decisions regarding Drake's involvement in baseball without consulting her. Lisa testified that Edward would make plans for Drake that were during Lisa's parenting time and changed the teams Drake was playing for without first consulting her. Lisa testified that she only became aware of Drake's baseball tournaments and Edward removing Drake from school to attend those tournaments because Drake informed her. Lisa testified that for baseball alone, Drake missed 12 days of school in one academic year. Lisa testified that Edward has made it clear that she cannot discuss baseball decisions with him until she is willing to pay for some of the associated expenses.

Edward, on the other hand, testified he and Lisa discussed the opportunity of Drake joining the Royals baseball team and that playing with that team would provide Drake with national exposure to college coaches. Edward testified that even though playing with the Royals would conflict with the Pacesetter season, Edward talked to the Pacesetter's coach and received permission for Drake to play with the Royals. Edward then explained that Drake eventually joined a New Jersey baseball team after Edward discussed the situation with both Lisa and Drake. Edward testified that the national exposure that Drake received due to his association with the New Jersey baseball team led to a $40,000 athletic scholarship from the University of Missouri.

Lisa and Edward each had an expert testify on their behalf. The testimony by Edward's witness, Haverkamp, was limited to ascertaining the value of Great Plains. Lisa's expert witness, Ahlf, testified regarding both the value of Great Plains and the total compensation Edward drew from his wholly-owned company.

### (a) Frank Haverkamp

Haverkamp explained that because Great Plains appeared to be in start-up mode during 2013 and 2014, he focused his valuation review on the 2015 and 2016 income information. Haverkamp testified the value of Great Plains was, in theory, approximately $73,000. Haverkamp testified that he computed the theoretical value of the company by ascertaining its "discretionary earnings" following the add back of the owner's compensation, multiplying these "discretionary earnings" by a factor or multiplier of 1.5, and reducing the product of the projected earnings by the amount of its then current liabilities. That said, Haverkamp explained that its "street value" as opposed to its theoretical value was zero because he was unsure that anyone would purchase a business that was so dependent on the relationships of its former owner. In relation to the business's theoretical value, Haverkamp testified he did not agree with Ahlf's valuation because Ahlf was "double-dipping" by adding money used to pay personal expenses in ascertaining discretionary earnings, but then reducing the company's liabilities by those same funds. Haverkamp acknowledged that he did not make an analysis of what, if any, of Edward's personal expenses were being paid in corporate funds but generally acknowledged that the analysis could impact the calculation of earnings in determining the theoretical valuation. However, he claimed that no bank would loan on such a calculation of higher earnings unless those earnings were properly presented in the tax returns.

### (b) Zachary Ahlf

In contrast, Ahlf ultimately valued Great Plains at $200,899. In a letter outlining his valuation method, Ahlf explained that, similar to Haverkamp, he computed the modified net cash

flow from the company and multiplied that cash flow by a factor or multiplier of 1.5 and subtracted liabilities. Both Ahlf and Haverkamp were in agreement that whether designated as "discretionary earnings" or "net cash flow," the computation required utilizing the company's 2016 net income of $52,000 (adjusted for non-cash deductions) and adding $50,000 in compensation that Edward reported on a form 1099 and included on Schedule C of his personal tax return. However, Ahlf's valuation departed from Haverkamp's in that, in calculating cash flow, he included Edward's personal expenditures which Ahlf believed were being paid with corporate funds.

The expenditures Ahlf identified as Edward's personal expenditures consisted primarily of expenditures on Edward's personal credit cards which were paid by the business and automobile expenses run through the business. Ahlf explained that Edward did not treat himself as an employee of the business, i.e. paid himself as a contractor and reported those payments on a form 1099 which Ahlf opined would, for tax purposes, result in a disallowance of employee business expenses. Ahlf noted that Edward was expensing both his and Lisa's car payments through the business even though Lisa did not work for the business and noted that Ahlf disallowed all expenses run through Edward's personal credit card as opposed to the business credit card, all of which expenses he allowed. After undergoing this exercise, Ahlf opined that Edward's true income from Great Plains was $180,127 for 2016 and $143,497 for 2015. Then taking a slightly lower number for net cash flow and utilizing a multiplier of 1.5 against the average modified cash flow of the business, followed by then reducing the product by a modified liability number, Ahlf calculated the value of Edward's business at $200,899. Ahlf acknowledged he did not perform a detailed audit of all credit cards in calculating Edward's modified income which he claimed would be cost prohibitive and because he was not supplied comprehensive detail to support such an exercise. Instead, he took the position that personal credit card debt paid with corporate funds was personal in character to Edward; Ahlf testified that this position is consistent with Internal Revenue Service (IRS) policies on the issue.

### 3. COURT ORDER AND POST-TRIAL MOTIONS

In December 2018, the court entered the dissolution decree. The district court determined Edward's monthly income was $13,484.33, making his annual income $161,811.96. The district court found it was in the minor child's best interest that the parties be awarded joint legal and physical custody, and ordered Edward to pay $779 per month in child support. The district court also ordered the parties to pay for the minor child's extracurricular activities such as baseball in the same percentage as the child support guidelines with Lisa being ordered to pay 31 percent and Edward being ordered to pay 69 percent of said expenses. The district court ordered Edward to pay any amount which becomes due from the parties' joint income tax returns for any year prior to the 2016 tax year and to indemnify Lisa and hold her harmless in regard to any liability which may become due. Edward was ordered to pay $1,000 per month in alimony commencing November 1, 2018, for 60 months. The trial court awarded Lisa her retirement account from her employer valued at $126,348 and awarded Edward Great Plains valued at $120,000. The district court ordered Edward to pay Lisa's attorney fees in the amount of $10,000. The district court also awarded Lisa an equalization payment of $9,582.50, taking into consideration the fact that Lisa was awarded her retirement plan, while Edward was awarded Great Plains and the marital residence with net equity.

Subsequently, Lisa filed a motion for a new trial and to alter or amend and the district court entered an amended decree of dissolution in January 2019. The district court overruled the motion for new trial but granted in part and denied in part the motion to alter or amend. The district court granted the motion to alter or amend regarding the alternating use of the income tax dependency exemption for the parties' minor child and ordered that the equalization payment be secured by real estate. The district court denied Lisa's request for retroactive child support. Edward appeals and Lisa cross-appeals the district court's order.

## III. ASSIGNMENTS OF ERROR

Edward argues, restated, that the district court erred in (1) determining that his annual income is $161,811.96, (2) valuing Great Plains at $120,000, (3) ordering him to pay $779 per month in child support for one minor child, (4) ordering him to pay $1,000 in spousal support per month for 60 months, (5) requiring him to pay any amount that may become due in regards to the parties' joint income tax returns for 2016 and any year prior, (6) ordering him to pay $9,582.50 as an equalization payment to Lisa, and (7) awarding $10,000 in attorney fees to Lisa.

Lisa cross-appeals arguing, restated, that the district court erred in (1) failing to award her sole legal custody of the parties' minor child and (2) failing to award her retroactive child support.

## IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

In an action involving a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

### 1. EDWARD'S ANNUAL INCOME

Edward first assigns that the trial court erred in determining that his annual income is $161,811.96. He argues that the computation was derived from speculative and contradictory testimony, that Lisa failed to satisfy her burden to show that Edward's tax returns were inaccurate, and that the court failed to use a 3-year average in determining his income.

In support of his contentions, Edward argues that, as a general rule, the Nebraska Supreme Court has held that income of self-employed persons can be determined from their tax return. *Rhoades v. Rhoades*, 258 Neb. 721, 605 N.W.2d 454 (2000). In furtherance of that rule, Edward attempts to argue that his 2015 and 2016 income tax returns depicted income that his income was $78,479 and $68,274 respectively. In making that computation, Edward attempts to simply pull values from his form 1040, line 12, business income, and line 17, S-Corporation income, and

suggests the sum of those line items represents his annual income. But a true depiction of Edward's actual income from those years is not quite that simple.

Edward is the 100-percent owner of Great Plains. In connection with that business, in addition to filing his annual income tax return, Edward prepared and filed annual S-Corporation tax returns.

In assessing income in connection with child support obligations, the Nebraska Supreme Court held in *Gangwish v. Gangwish*, 267 Neb. 901, 911-12, 678 N.W.2d 503, 513-14 (2004):

> The Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, a court must consider the total monthly income, defined as the income of both parties derived from all sources, except all means-tested public assistance benefits and payments received for children of prior marriages. *Marcovitz v. Rogers,* 267 Neb. 456, 675 N.W.2d 132 (2004); Nebraska Child Support Guidelines, paragraph D. In the past, we have not set forth a rigid definition of what constitutes "income," but have instead relied on a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases. *Workman v. Workman,* 262 Neb. 373, 632 N.W.2d 286 (2001). Thus, income for the purpose of child support is not necessarily synonymous with taxable income. *Gase v. Gase,* 266 Neb. 975, 671 N.W.2d 223 (2003); *Rhoades v. Rhoades,* 258 Neb. 721, 605 N.W.2d 454 (2000); *Rauch v. Rauch,* 256 Neb. 257, 590 N.W.2d 170 (1999).

> We take a flexible approach in determining a person's "income" for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. Thus, a court is allowed, for example, to add "in-kind" benefits derived from an employer or third party to a party's income. See, *Workman, supra; State on behalf of Hopkins v. Batt,* 253 Neb. 852, 573 N.W.2d 425 (1998); *Baratta v. Baratta,* 245 Neb. 103, 511 N.W.2d 104 (1994). Likewise, we believe that a party's income, for purposes of determining child support, does not necessarily stop at the corporate structure of a closely held corporation. Although, ordinarily, a corporation is regarded as a separate entity, distinct from the members who compose it, equity allows a court to disregard the corporate veil when necessary to do justice. See *Medlock v. Medlock,* 263 Neb. 666, 642 N.W.2d 113 (2002). As noted previously, "justice," in child support determinations, is the best interests of the child. *Claborn, supra.*

> Thus, we determine that under the appropriate factual circumstances, equity may require a trial court to calculate a party's income by looking through the legal structure of a closely held corporation of which the party is a shareholder. Stated otherwise, equity may demand that a court consider as income the earnings of a closely held corporation of which a party is a shareholder. The real question, however, is deciding what type of factual scenario justifies casting aside the corporate identity to place corporate income on the shareholder's side of the ledger.

Applying that rationale, the trial court reviewed the testimony of Edward's expert, Haverkamp, and Lisa's expert, Ahlf. Both experts analyzed the value of actual earnings generated from Great Plains in relation to computing Great Plains' value which we will discuss more extensively in the next section of this opinion. Ahlf went further and provided an extensive analysis

of Edward's full income, albeit in different forms, which Great Plains paid to or for the benefit of Edward. As it relates to Edward's income, both experts were in agreement that for taxable year 2016, Great Plains generated earnings (net of depreciation and non-cash deductions) of $52,000. Both experts likewise concluded that Great Plains paid Edwards $50,000 in compensation which Edward reported on Schedule C on his tax return. Although Ahlf took issue with Edward reporting this $50,000 compensation on Edward's individual income tax return on Schedule C and not reporting it as salary, there was no question that $50,000 in compensation was paid to Edward. Second, as depicted on exhibit 30, Ahlf opined, and Haverkamp did not dispute that during 2016, Great Plains made cash payments to Edward in the amount of $106,167. Ahlf then demonstrated that the Great Plains tax returns and financial statements revealed that Great Plains distributed all of its earnings to Edward. Taken together, the unrefuted testimony at trial indicates that cash payments from Great Plains to Edwards consisted, at a minimum, of both Edward's compensation and the company's full earnings.

The two experts then testified about the character of additional earnings for 2016. Ahlf demonstrated through exhibit 30 that, in addition to cash paid by Great Plains to Edward, Great Plains paid personal obligations of Edward and Lisa with corporate funds which were then improperly deducted on the corporate tax return. Ahlf testified that these expenditures consisted mainly of personal credit card charges and expenses for both Edward and Lisa's automobiles. The expenditures also included a "payment to Tri-State" of $3,983 and a payment to Carlson Burnett of $2,000. In sum, Ahlf opined that all such personal expenditures paid by Great Plains in the total amount of $73,960, must be added to actual cash payments made to Edward in computing his actual earnings for the year. Ahlf employed a similar methodology in computing Edward's income for 2015 in arriving at $143,497. Ahlf then opined that the Edward's average for the combined years was $161,812 which the court adopted in computing Edward's support obligations.

In including the $73,960 in personal expenditures in his modified income calculation, Ahlf provided numerous reasons for their inclusion. First, he noted that although Edward had not provided all relevant detail, the personal credit cards appeared to include large charges related to the parties' automobiles, payments to Edward's divorce attorney, and other personal obligations. Second, he noted that due to the peculiar reporting of Edward's compensation on Schedule C of his return and not treating Edward as an employee of Great Plains, the IRS would disallow all employee-related deductions such as deductions for an employee's automobile expenses, meals and entertainment, etc. Third, Ahlf opined that because Edward was the owner of more than 2 percent of his company, the IRS would not allow corporate level deductions in the manner taken on the tax return. Fourth, he separately opined that in addition to the credit cards, the same rationale would result in a disallowance of the automobile expenses. In that regard, Ahlf noted that the business tax returns included deductions for Lisa's vehicle even though Lisa was not involved in the business and that sometimes Edward took additional automobile deductions on his personal return in addition to the business return. Finally, even though Ahlf was unable to audit Edward's personal credit card statements, he opined the IRS would disallow deductions taken by Great Plains in paying personal credit card obligations without an accountable reimbursement plan which it did not have and that, when combined with the issues discussed above, Edward's inclusion of these expenses as business-related deductions would result in a disallowance in full of these items by the IRS.

In response, Edward argues that Lisa failed to satisfy her burden of persuasion of showing that these alleged personal expenditures, which were listed on his corporate tax return by his accountant, were not valid business deductions. He argues Ahlf's failure to perform an itemized audit of the individual expenditures taken together with his accountant's decision to include them as deductible business expenditures resulted in a failure by Lisa to establish the personal character of these expenditures as was her burden.

We first note that even Edward conceded at trial that Great Plains may have paid some amount of personal expenditures with business funds and that both Ahlf and the record in different places provided examples of credit card charges for personal items which were paid with business funds. Second, we note that Edward failed to call his accountant to testify to refute any of the Ahlf's allegations in relation to the alleged improper reporting of these expenditures as individual business deductions on Edward's tax return. Third, Haverkamp, who was called as an expert by Edward, never refuted any of Ahlf's allegations in relation to the improper preparation of Edward's tax returns or the personal character of the expenditures listed by Ahlf on exhibit 30. As a result, the district court was left with Ahlf's unrefuted testimony that the items listed on exhibit 30 would be recharacterized by the IRS as personal expenditures and disallowed on the business tax return for the myriad of reasons stated by Ahlf.

Further, as to the "payment to Tri-State" in the amount of $3,983, Ahlf testified that the amount paid to Tri-State (Edward's former company) would be characterized as income to Edward despite its depiction on Great Plain's books as a repayment of a loan to Tri-State, a former, now defunct, entity. After reviewing this evidence, we cannot say that the court abused its discretion in finding that Edward's modified income from Great Plains was $161,812. Taken together, Edward's direct compensation from Great Plains, Great Plains distribution of its earnings (net of depreciation) to Edward, together with Edward's personal expenditures paid by Great Plains in the amount opined by Ahlf support the court's determination that Edward's modified income for the taxable years of 2015 and 2016 averaged $161,812. In so ruling, we hold that the equities associated with Edward's utilization of his wholly-owned business entity and his tax return reporting, when viewed through the testimony provided at trial, supports the court's finding of Edward's true modified income for those years.

This leaves only Edward's argument that the district court erred in only utilizing 2 years of income rather than 3 years in computing his average income. In support of that contention, Edward argues:

> The Nebraska Child Support Guidelines provides that "[i]n the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the percent of contribution of each parent . . ." worksheet 1 (fourth footnote). Additionally in *Gress v. Gress*, [271 Neb. 122, 710 N.W.2d 318 (2006),] the Supreme Court of Nebraska examined the income average used by numerous jurisdictions, and noted that a three-year average was the most common approach in cases where a parent's income fluctuated. *Gress*, 274 Neb[.] at 694, 743 N.W.2d at 75 (2007). Furthermore, and more importantly, the Supreme Court noted that

"it appears that income averaging is almost always discussed with reference to a 3-year average in Nebraska." *Gress*, 274 Neb[.] at 693, 753 N.W.2d at 74.

Brief for appellant at 15.

While *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006), acknowledged that both in Nebraska, and other jurisdictions, a 3-year average is the most common averaging period for fluctuating incomes, it did not make a 3-year period mandatory, nor even establish a rebuttable presumption. In fact, the Supreme Court has approved other averaging periods when the circumstances dictated in favor of that application. See *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). Here, Edward's own expert, Haverkamp, testified that in fixing the value of Great Plains, he only used the two most recent years of business production because, prior to that period, Great Plains was in a start-up mode rendering that financial information less reliable. Because Edward's income production comes directly from Great Plains, the trial court concluded that its most recent 2-year cycle provided a more accurate indication of Great Plains' value and Edward's income. The trial court did not abuse its discretion in making this determination and this argument fails.

## 2. VALUATION OF GREAT PLAINS

Edward next assigns that the district court erred in valuing Great Plains at $120,000. In furtherance thereof, Edward points to the testimony of Haverkamp and Ahlf and argues the court's conclusion as to value "is not reasonable because the valuation is not based [upon] fact and/or principle." Brief for appellant at 25.

Contrary to this assertion, the expert testimony from Haverkamp and Ahlf was similar in many respects. Both experts acknowledged that in ascertaining the value of this small business, the process began with a calculation of modified earnings for the business or net cash flow produced by the business upon which a valuator would factor a multiple of those earnings, representing a value a buyer would pay for a return of those earnings in the future, reduced by the company's liabilities. Both agreed to the company's earnings of $52,000, properly reduced for depreciation, and then added Edward's compensation of $50,000. Ahlf then added additional "cash flow" for personal credit card expenses paid to the business, as discussed in the previous section of this opinion, which Haverkamp did not. Haverkamp did not dispute that applying personal expenditures paid by the business is theoretically an appropriate addition to ascertaining net cash flow, but testified that he did not undergo that analysis and that a tax return would have to reflect proper cash flow for a bank to lend against it. Both experts then likewise assigned a multiple of 1.5 to their cash flow determinations and then differed in their reduction of liabilities.

In ascertaining the proper multiple, both experts agreed that a factor of 1.5 was appropriate for a small, closely held business in that the risk in recovering an investment was greater for a small business than a larger one. Both agreed that this multiple was appropriate for this industry.

Ahlf only reduced the product of his modified earning amount and multiplier by $33,274 in liabilities while Haverkamp reduced his computation by $75,000 in liabilities. Again, the difference between the experts had to do with Ahlf's belief that the liabilities of the business included some personal obligations.

- 10 -

Notwithstanding their difference, as we previously explained, we believe the district court did not abuse its discretion in finding that the average income to Edward from the business was $161,812 for the years 2015 and 2016, nor was it an error to include the personal credit card expenditures paid by the business as "cash flow" in calculating the value of the business utilizing both experts agreed methodologies. Correspondingly, when multiplied by the agreed factor of 1.5, the value of Great Plains was at least $120,000 regardless of whether the product of net cash flow and the 1.5 multiplier is reduced by some or all of Great Plains' liabilities. Accordingly, utilizing the methodology proffered by both experts and accepting the modified net cash flow adopted by Ahlf, the court did not err in failing to find a value for the business under $120,000.

In reaching this decision, we are cognizant of Haverkamp's testimony that as a business broker, he would not list Edward's business because of its dependency on Edward in operating it and the limited potential buyers of such a business. That said, based upon the testimony of both experts governing the small multiplier utilized in connection with valuing riskier ventures, we find Haverkamp's testimony to be somewhat contradictory, i.e., that the nature of this small business and dependency on its owner warrants the small multiplier vis a vis has no value, and hold that the district court did not abuse is discretion in setting a value for Great Plains in an amount not less than $120,000.

### 3. CHILD SUPPORT

Edward argues that the district court erred in ordering him to pay $779 in child support. He contends that because the court erred in its determination of his income at $161,812, it correspondingly erred in calculating his obligation for child support. In the alternative, Edward argues that should the court agree with the district court's income determination, it should find that the child support obligation is not in the best interest of the child.

As to Edward's first argument, because we found that the court did not err in its determination of Edward's income, it did not err in its calculation of Edward's child support obligation on the basis of using that number in the calculation. This portion of Edward's assignment thus fails.

Edward separately argues that the provision of child support must be determined by considering the best interests of the child, and that a best interest analysis here would dictate in favor of no separate child support award.

We have previously articulated:

The paramount concern and question in determining child support is the best interests of the child. See *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). In general, child support payments should be set according to the Nebraska Child Support Guidelines, adopted by the Nebraska Supreme Court, which are presumed to be in the best interests of the child.

*Burcham v. Burcham*, 24 Neb. App. 323, 333, 886 N.W.2d 536, 548 (2016).

Notwithstanding this presumption, Edward argues that Drake's athletic ability makes him a good candidate for future scholarships if he is continually exposed through expensive baseball tournaments and associated exposures. He argues that Edward's former and future funding of these events and travel should obviate the need for separate child support.

The pertinent language of Neb. Rev. Stat. § 42-364.17 (Reissue 2016) provides, "[a] decree of dissolution . . . . shall incorporate financial arrangements for each party's responsibility for reasonable and necessary medical, dental, and eye care, medical reimbursements, day care, extracurricular activity, education, and other extraordinary expenses of the child and calculation of child support obligations." The Nebraska Supreme Court noted:

"Support" is commonly defined as "a means of livelihood, sustenance, or existence." The common meaning of "support" clearly includes all of the incidents of a child's needs. Of course, one incident of "support" is the regular monthly payment established under the guidelines. But the guidelines recognize other incidents of "support" that are wholly or partly outside of the monthly installment. The expenses stated in § 42-364.17--including, among others, extracurricular, education, and other extraordinary expenses--merely represent other incidents of "support" to be addressed in a dissolution decree.

*Caniglia v. Caniglia*, 285 Neb. 930, 934, 830 N.W.2d 207, 211 (2013).

Although we recognize the importance of Drake's potential extracurricular activities and expense, we cannot see those as supplanting the most basic provision for his livelihood, sustenance, and existence which are captured through the monthly payment obligation established under the guidelines. We therefore reject any contention that the court erred in awarding the regular monthly payment obligation under the guidelines under the auspices that reducing or eliminating that obligation would be in the best interests of Drake. This assignment of error fails.

### 4. SPOUSAL SUPPORT

Edward argues the district court erred in awarding spousal support to Lisa because the factors governing alimony awards, the parties' income and earning capacity, and the equities of the situation do not support an award.

Neb. Rev. Stat. § 42-365 (Reissue 2016) provides:

When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

Additionally, in *Dooling v. Dooling*, 303 Neb. 494, 515-16, 930 N.W.2d 481, 500 (2019), the Nebraska Supreme Court stated:

considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. Alimony is not a tool to equalize the parties'

income, but a disparity of income or potential income might partially justify an alimony award.

. . . .

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

An appellate court does not decide whether it would have awarded the same amount of alimony as the lower court. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018).

Here, the parties were married for 25 years and the evidence indicates a significant disparity in the circumstances of the parties. Lisa works as a school counselor and in 2016 earned a gross monthly income of approximately $5,600 and has a pension and healthcare provided for her through her employment. By comparison, Edward is self-employed and earned over $160,000 in 2016 as we articulated in a previous section of this opinion. The district court awarded Lisa alimony in the amount of $1,000 per month for 60 months. After reviewing the record, we find the district court's award of alimony was not untenable such as to deprive Edward of a substantial right or just result, and thus, the district court did not abuse its discretion in awarding alimony to Lisa.

### 5. JOINT INCOME TAX LIABILITY

Edward next argues that the district court erred in requiring him to solely pay any tax liability that might become due in relation to the parties' joint tax returns for the year 2016 and any prior year. He argues that income tax liability incurred during the marriage is generally treated as a marital debt; therefore, any amount that becomes due under the parties' joint tax returns for 2016 and any prior year should be split between the parties.

In *Wiech v. Wiech*, 23 Neb. App. 370, 871 N.W.2d 570 (2015), the parties' unpaid tax liabilities in the amount of $6,800 constituted a marital debt that was subject to equitable division upon divorce; although the husband may have attempted to minimize his tax withholdings during the marriage, the additional income he retained benefited both parties during the marriage, and there was no evidence that he spent significant funds on nonmarital pursuits. Specifically, this court stated:

Because income tax liability incurred during the marriage is one of the accepted costs of producing marital income, income tax liability should generally be treated as a marital debt. *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000). In *Meints*, the Supreme Court required that the husband's tax liability amount be treated as marital debt even for returns the parties filed separately, but any statutory penalties assessed for delinquent filing is treated as a nonmarital debt solely attributable to the filing spouse. The court cautioned, however, that equity may not demand the same result if credible evidence

establishes that the delinquent taxpaying spouse spent significant funds on nonmarital pursuits. *Id*.

*Wiech v. Wiech*, 23 Neb. App. at 380, 871 N.W.2d at 578.

Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Patton v. Patton*, 20 Neb. App. 51, 818 N.W.2d 624 (2012).

Here, Lisa testified she did not have access to Edward's financial records and further testified that when she tried to contact the accountant who compiled the parties' joint tax returns, the accountant did not return her phone calls and she was unable to obtain copies of the parties' personal joint tax returns. Additionally, Ahlf testified as to his concerns governing the presentation by Edward and his accountant of tax returns filed in 2016 and prior years relating to Edward's classification of himself as a nonemployee of the business and inclusion of personal credit card debt and other personal expense on the business return. Because of these concerns and his lack of transparency with Lisa in connection with this prior business tax preparation relating to a business owned 100 percent by Edward, we do not find the court's order requiring Edward to be personally liable for any future tax obligations relating to these returns to be inequitable. In so finding, we first note that there is no current tax obligation known at this time. It appears that all known tax obligations in relation to 2016 and previous tax years had been paid prior to trial. Accordingly, the court's award goes to the potential of future obligations in light of the testimony governing tax return preparation. This preparation relates solely to the court's concern governing Edward's solely owned business, tax preparation related thereto, and expenses paid for by the business all of which appear to be solely in Edward's control. Under these circumstances, we hold that the district court did not err in ordering Edward to pay any income tax liability that might become due in relation to the parties' joint tax returns for the year 2016 and any years prior.

## 6. EQUALIZATION PAYMENT

Edward argues the district court erred in ordering him to pay an equalization payment because it was based on the erroneous valuation of Great Plains. Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Patton v. Patton, supra*. As we explained previously, the district court valued Great Plains at $120,000, which valuation was supported by the testimony of Ahlf, and at least in part, by the testimony of Haverkamp. Consequently, the district court did not err in ordering Edward to pay an equalization payment on the basis of this valuation and this assignment of error fails.

## 7. ATTORNEY FEES

Edward's final assignment of error is that the district court erred in ordering Edward to pay $10,000 of Lisa's attorney fees.

Recently, in *Moore v. Moore*, 302 Neb. 588, 604-05, 924 N.W.2d 314, 325-26 (2019), the Nebraska Supreme Court stated:

[I]n dissolution cases, as a matter of custom, attorney fees and costs are awarded to prevailing parties. Finally, a uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. . . .

. . . .

In an action involving a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Here, Lisa provided an affidavit which showed that, as of October 10, 2018, she had incurred $29,730.96 in attorney fees, the attorney's hourly rate, and an itemized list of services and the hours spent on each service. The record further reflects that, throughout the dissolution proceedings, Edward refused to comply with court orders, such as discovery requests, and Lisa's attorney drafted and filed multiple motions for sanctions and attended multiple hearings due to Edward's failure to comply with court orders. The district court found Edward failed to comply with court orders and held him in contempt for violating temporary orders. As explained previously, attorney fees are warranted when a party unnecessarily expands the proceeding by improper conduct. See *id*. As noted by the district court, Lisa was the prevailing party on child support, alimony, and retaining her retirement account. After considering each of these factors, we conclude that the district court did not abuse its discretion in awarding her attorney fees in the amount of $10,000.

## 8. LISA'S CROSS-APPEAL

### (a) Sole Legal Custody

Lisa cross-appeals arguing the trial court abused its discretion in awarding joint legal custody instead of awarding her sole legal custody of Drake because she and Edward struggle with communication issues.

"Joint legal custody" is the mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health. A trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests.

*Blank v. Blank*, 303 Neb. 602, 619, 930 N.W.2d 523, 536 (2019). We have previously noted, "communication is an essential requirement for joint custody to be successful." *Klimek v. Klimek*, 18 Neb. App. 82, 88, 775 N.W.2d 444, 450 (2009).

The district court specifically found joint legal custody was in Drake's best interests. We first note that the parties had originally stipulated to joint legal custody earlier in these proceedings. While Lisa testified she and Edward had developed communication problems, Edward testified communication had actually improved by the time of the trial. Because the district court considered

- 15 -

the best interests of the minor child and found joint legal custody was in his best interests, and apparently also found Edward's testimony on the subject of the parties' ability to communicate in relation to Drake to be credible, we cannot say the district erred in awarding joint legal custody. *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another).

(b) Retroactive Child Support

Lisa next argues that the district court erred in not awarding her retroactive child support to August 1, 2016.

Whether a child support order should be retroactive is entrusted to the discretion of the trial court and will be affirmed absent an abuse of discretion. *Wilkins v. Wilkins*, 269 Neb. 937, 697 N.W.2d 280 (2005).

Here, the district court ordered child support but not retroactive child support. Abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017). Those factors are not present here. The second temporary order required Edward to pay the children's extracurricular expenses and clothing until further order of the court. The children's extracurricular expenses in this case are significant. Thus, Edward contributed significantly to the support of the children prior to being ordered to pay child support commencing November 1, 2018, and we cannot say the district court abused its discretion in finding it equitable to not award retroactive child support in light of Edward's prior unilateral extracurricular support obligations during the pendency of this dissolution proceeding.

VI. CONCLUSION

Based on the foregoing analysis, we affirm the district court's order in its entirety.

AFFIRMED.